**UNITED STATES of America, Plaintiff,**

v.

**Victor M. GARCIA, Defendant.**

**No. 98–40113–01–SAC.**

United States District Court, D. Kansas.

April 27, 1999.

---

Anthony W. Mattivi, Office of United States Attorney, Topeka, KS, for plaintiff.

David J. Phillips, Marilyn M. Trubey, Office of Federal Public Defender, Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, District Senior Judge.

On December 1, 1998, the grand jury returned a superceding indictment charging the defendant with two counts of violating federal drug trafficking laws. In count 1 the defendant is charged with possession with intent to distribute 214 grams of methamphetamine. In count 2 the defendant is charged with possession with intent to distribute 1766 grams of a mixture or substance of amphetamine. According to the government's proffer, the narcotics were seized during a search of the vehicle operated by the defendant—a vehicle which had been stopped for speeding.

On December 22, 1998, this court entered a memorandum and order denying the relief sought in Garcia's motion to review the order of detention. *See* (Dk.25). *See United States v. Garcia,* 1998 WL 1054231 (D.Kan. Dec. 22, 1998).[1] On Feb-

---

1. In the court's decision denying the relief sought in the defendant's motion to review the order of detention entered by the magistrate judge, the court indicated that it would reconsider its ruling *"if* the defendant could propose a practicable release plan that would include residency and employment in the Topeka area."

On January 27, 1999, the court received a letter from defendant's counsel which indicates that her office was unable to procure employment for the defendant or find a place for him to live because he is currently incarcerated. The letter goes on to suggest that if the court would release the defendant from custody he could obtain employment and rent an apartment.

This "release plan" proposed by the defendant falls decidedly short of allaying the court's concern that this defendant poses a risk of flight and danger to the community. The defendant's request to reconsider its previous order affirming the order of detention is denied.

ruary 19, 1999, this court entered a memorandum and order denying the defendant's "Motion and Memorandum for Leave to Issue Subpoena Requiring Pretrial Production of Documents Pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure" (Dk.28). *See United States v. Garcia,* 1999 WL 318363 (D.Kan. Feb. 19, 1998) (records regarding race of persons stopped by trooper irrelevant for Fourth Amendment challenge to stop; defendant fails to make adequate showing that he is entitled to the records for his equal protection challenge).

This case comes before the court upon the following pretrial motions filed by the defendant:

1) Motion to Preserve Evidence (Dk.9).

2) Motion and Memorandum in Support of Motion to Suppress Evidence (Dk.30).

3) Motion to Suppress Statement (Dk.29).

4) Motion to Strike (Dk.36).[2]

The government filed a consolidated response opposing the defendant's motion to suppress but its response does not mention or respond to the defendant's "Motion to Preserve Evidence." *See* (Dk.31). The government subsequently filed a response to the defendant's motion to preserve evidence. *See* (Dk.35).

**1) Motion to Preserve Evidence (Dk.9).**

The defendant seeks an order compelling "the proper custodian as may be applicable, to preserve any and all tape recording of radio transmissions, dispatches and/or telephone calls in any way relating to the above-named accused who was stopped by law enforcement officers on October 3, 1998, in Lincoln County, Kansas." The defendant also seeks an order compelling Kansas Highway Patrol Troopers DeVore and Heim, and any other law enforcement officers involved in the stop and arrest of Mr. Garcia to preserve their field notes and any draft reports prepared in this matter, and to furnish defense counsel with copies of same.

The government's consolidated responses to the defendant's pretrial motions makes no reference to this motion. However, on February 22, 1999, the government filed a response to this motion. As to the tape recordings, the government indicates that it will provide those tapes if they still exist. If they do not still exist, they obviously cannot be preserved. In either event, the government contends that the defendant's request to preserve the tapes should be denied as moot. The government opposes an order requiring production of field notes and draft reports, arguing that those items are not discoverable under Fed.R.Crim.P. 16 or *Jencks.* The government also notes the defendant's failure to comply with the requirements imposed by this court's *Criminal Procedural Guidelines* for filing discovery requests.

*Request for Tapes*

In light of the government's response, this motion is denied as moot.

*Field Notes and Drafts of Reports*

The court orders the government's counsel to direct the agents involved in this case not to destroy any field notes or draft reports compiled in this case. As for whether any of the field notes, draft reports or other documents possessed by the government constitute statements under the Jencks Act, 18 U.S.C. § 3500, the court expects the government will review the same and apply the tests as outlined in *United States v. Jackson,* 863 F.Supp. 1449, 1456–58 (D.Kan.1994), *aff'd,* 76 F.3d 1145 (10th Cir.1996), and *United States v. Jackson,* 850 F.Supp. 1481, 1507–08 (D.Kan.1994). Should the government have a serious question concerning whether any of the notes or reports have been adopted by the witness, the government

---

**2.** The defendant's motion to strike the "Government's Response to Defendant's Motion to Preserve Evidence" is denied.

will submit the same for in camera inspection.

## 2) Motion and Memorandum in Support of Motion to Suppress Evidence (Dk.30).

Garcia seeks an order suppressing evidence seized from the vehicle that he was driving on October 3, 1998. The defendant's motion to suppress essentially has two components. First, the defendant contends that he was not unlawfully speeding and therefore the initial stop was unlawful. The defendant contends that the stop was racially motivated and therefore a violation of the Equal Protection Clause. Second, in the event that the court finds probable cause to stop the vehicle, the defendant contends that his consent to search his vehicle was not voluntary, primarily because he was unlawfully detained after receiving the verbal warning for speeding, that he was not told he was free to go on his way, and that Trooper DeVore wanted to check the vehicle first.

The government's responds, opposing the defendant's motion. The government contends that the initial stop of the vehicle for speeding and changing lanes without a turn signal was proper. The government contends that under the circumstances, the detention of the defendant was proper. As to the length of the stop, the government contends that given the facts and circumstances known to Trooper DeVore, the forty minutes between the initial stop and the search of the vehicle was reasonable.

### Governing Law

■ The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996). There are three general types of citizen-police encounters: (1) consensual encounters that are not Fourth Amendment seizures as they involve a person's voluntary cooperation with an officer's non-coercive questioning; (2) investigative detentions which are Fourth Amendment seizures justified only if there is reasonable suspicion that the person has committed or is committing a crime; and (3) arrests which are Fourth Amendment seizures characterized by highly intrusive or lengthy detention and justified only if there is probable cause to believe that the person has committed or is committing a crime. *United States v. Seslar,* 996 F.2d 1058, 1060 (10th Cir.1993). Because the temporary stop of an automobile is considered a seizure of "persons," it must not be "unreasonable." *Whren,* 116 S.Ct. 1769, 135 L.Ed.2d at 95. The stop is "reasonable" if the law enforcement officer has "probable cause to believe that a traffic violation has occurred." *Whren,* 116 S.Ct. 1769, 135 L.Ed.2d at 95 (citations omitted).[3]

■ The detention associated with the traffic stop also "must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Anderson,* 114 F.3d 1059, 1063 (10th Cir.1997) (quoting *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Such a detention "usually must 'last no longer than is necessary to effectuate the purpose of

3. In *United States v. Botero–Ospina,* 71 F.3d 783 (10th Cir.1995), the Tenth Circuit set for these standards for evaluating the validity of a traffic stop:

> [A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. It is irrelevant, for purposes of Fourth Amendment review, "whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the

particular officer making the stop." *Ferguson,* 8 F.3d at 391. It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle. Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated "any one of the multitude of applicable traffic and equipment regulations" of the jurisdiction.

*Id.* at 787 (footnote omitted). *See Whren,* 517 U.S. at 813, 116 S.Ct. 1769 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

the stop,' and '[t]he scope of the detention must be carefully tailored to its underlying justification.'" *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir.1998) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Hunnicutt*, 135 F.3d at 1349; *see United States v. Mendez*, 118 F.3d 1426, 1429 (10th Cir.1997). "Once the officer has conducted such a check and 'the driver has produced a valid license and proof that he is entitled to operate the car, [the driver] must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.'" *United States v. Anderson*, 114 F.3d at 1064 (quoting *United States v. Gonzalez–Lerma*, 14 F.3d 1479, 1483 (10th Cir.), *cert. denied*, 511 U.S. 1095, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994)).

▮ There are two circumstances when detention can be lengthened by additional questioning. "First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring." *United States v. Hunnicutt*, 135 F.3d at 1349 (citation omitted); *see also United States v. Elliott*, 107 F.3d 810, 813 (10th Cir.1997). Second, further questioning unrelated to the initial stop is permissible if the initial detention is over and the encounter becomes consensual with the driver voluntarily consenting to additional questions. *United States v. Mendez*, 118 F.3d at 1429; *see also United States v. Hunnicutt*, 135 F.3d at 1349.

### Investigative Detention

"An investigative detention may be expanded beyond its original purpose, however, if during the initial stop the detaining officer acquires "reasonable suspicion," of criminal activity, *United States v. Jones*, 44 F.3d 860, 862 (10th Cir.1995), that is to say the officer must acquire a "particularized and objective basis for suspecting the

particular person stopped of criminal activity. *[United States v. ]Wood*, 106 F.3d [942] at 946 [10th Cir.1997) ]." *United States v. Villa–Chaparro*, 115 F.3d 797, 801–02 (10th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 326, 139 L.Ed.2d 252 (1997).

"A variety of factors may contribute to the formation of an objectively reasonable suspicion of illegal activity." *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir.1998). "The law does not specify a minimum of factors necessary to constitute reasonable suspicion." *United States v. Gutierrez–Daniez*, 131 F.3d 939, 942 (10th Cir.1997) (citation omitted), *cert. denied*, —— U.S. ——, 118 S.Ct. 1334, 140 L.Ed.2d 494 (1998). Arriving at reasonable suspicion is a process dealing with probabilities, not hard certainties, " 'as understood by those versed in the field of law enforcement.'" *United States v. Gutierrez–Daniez*, 131 F.3d at 942 (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

Among those factors that have justified further questioning are having no proof of ownership of the vehicle, having no proof of authority to operate the vehicle, and inconsistent statements about destination. *See United States v. Jones*, 44 F.3d 860, 872 (10th Cir.1995); *Gonzalez–Lerma*, 14 F.3d at 1483–84; *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir.1990), *cert. denied*, 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991). Also among those are driving with a suspended license, *see Jones*, 44 F.3d at 872, and reluctance to stop, *see id.; Villa–Chaparro*, 115 F.3d at 802; *United States v. Walraven*, 892 F.2d 972, 975 (10th Cir.1989). In particular, the inability to offer proof of ownership or authorization to operate the vehicle has figured prominently in many of our cases upholding further questioning. *See United States v. Horn*, 970 F.2d 728, 732 (10th Cir.1992); *United States v. Turner*, 928 F.2d 956, 959 (10th Cir.), *cert. denied*, 502 U.S. 881, 112 S.Ct. 230,

116 L.Ed.2d 187 (1991); *United States v. Arango*, 912 F.2d 441, 447 (10th Cir. 1990), *cert. denied*, 499 U.S. 924, 111 S.Ct. 1318, 113 L.Ed.2d 251 (1991); *see also United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir.1994) (The "defining characteristic of our traffic stop jurisprudence is the defendant's lack of ... some ... indicia of proof to lawfully operate and possess the vehicle in question, thus giving rise to objectively reasonable suspicion that the vehicle may be stolen.")

*Hunnicutt*, 135 F.3d at 1345.

"Police officers need not close their eyes to suspicious circumstances." *Hunnicutt*, 135 F.3d at 1349 (citation omitted). Indeed, the officer "is entitled to assess the facts in light of his experience" when it comes to detecting criminal activity. *United States v. Brignoni–Ponce*, 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). "Law enforcement officers may perceive meaning in actions that appear innocuous to the untrained observer." *United States v. Gutierrez–Daniez*, 131 F.3d at 942 (citation omitted). On the other hand, an officer may not detain someone on an "unparticularized suspicion or hunch." *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "While the necessary 'level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence,' the Fourth Amendment requires 'some minimal level of objective justification.'" *United States v. Gutierrez–Daniez*, 131 F.3d at 942 (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (internal quotations omitted)).

In evaluating the factors alleged in support of reasonable suspicion, the court "judge[s] the officer's conduct in light of common sense and ordinary human experience." *United States v. Mendez*, 118 F.3d at 1431 (citation omitted). "This approach is intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspi-cious actions." *United States v. Gutierrez–Daniez*, 131 F.3d at 941 (quoting *United States v. Alvarez*, 68 F.3d 1242, 1244 (10th Cir.1995), *cert. denied*, 517 U.S. 1143, 116 S.Ct. 1436, 134 L.Ed.2d 557 (1996)). In *Mendez*, the Tenth Circuit summarized the court's approach in this way:

"Our task ... is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious," *United States v. Lopez–Martinez*, 25 F.3d 1481, 1484 (10th Cir.1994), but rather to determine whether the totality of the circumstances justify the detention. [*United States v.*] *McRae*, 81 F.3d [1528] at 1534 [(10th Cir.1996)]. We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, *id.*, remembering that reasonable suspicion represents a "minimum level of objective justification" which is "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citation omitted).

.... Although activities entirely consistent with innocent travel can, and frequently do, contribute to reasonable suspicion, *id.* at 9[, 109 S.Ct. 1581], some facts are so innocuous and "so susceptible to varying interpretations" that they carry little or no weight. *United States v. Lee*, 73 F.3d 1034, 1039 (10th Cir. 1996).

118 F.3d at 1431. "The government bears the burden of proving the reasonableness of the officer's suspicion." *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998).

### Additional Delay While Waiting for Drug Dog

■ If the facts gleaned during the stop amount to reasonable suspicion of drug trafficking, additional delay to obtain a drug dog to sniff the vehicle may be justified. The Tenth Circuit has held that an extended detention of almost forty minutes spent waiting for a drug-sniffing dog did not violate the Fourth Amendment. *See*

*United States v. Villa–Chaparro*, 115 F.3d 797, 802–03 (10th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 326, 139 L.Ed.2d 252 (1997).

## Consensual Searches

■ Under the Fourth and Fourteenth Amendments a search conducted without a warrant issued upon probable cause is per se unreasonable, subject only to a few specifically established and well-delineated exceptions. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A search authorized by consent is wholly valid and is a well-recognized exception to the prohibition against warrantless searches. 412 U.S. at 219, 93 S.Ct. 2041. Voluntariness is a question of fact to be determined from the totality of all the circumstances. 412 U.S. at 227, 93 S.Ct. 2041. The government has the burden of proving the voluntariness of the consent. 412 U.S. at 222, 93 S.Ct. 2041; *United States v. Soto,* 988 F.2d 1548, 1557 (10th Cir.1993) ("The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue."). The government "must demonstrate with 'clear and positive testimony that consent was "unequivocal and specific" and "freely and intelligently" given.'" *United States v. Dewitt,* 946 F.2d 1497, 1500 (10th Cir.1991) (*quoting United States v. Abbott,* 546 F.2d 883, 885 (10th Cir.1977)), *cert. denied,* 502 U.S. 1118, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992). The government must also prove that the consent was given without duress or coercion, express or implied. *Id.*

■ The Tenth Circuit has developed a two-step inquiry to determine whether the government has sustained its burden of showing that the consent to search was voluntary. To admit evidence obtained from a search, wherein consent was given, the following must be found:

(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and

(2) The government must prove consent was given without duress or coercion, express or implied.

*United States v. Butler,* 966 F.2d 559, 562 (10th Cir.1992) (*citing United States v. Price,* 925 F.2d 1268, 1270–71 (10th Cir. 1991)). "When making this determination, the court should not presume that the consent was either voluntary or involuntary." *Soto,* 988 F.2d at 1557.

## Factual Findings Regarding Stop and Detention

On October 3, 1998, at approximately 11:50 a.m., Trooper Jason DeVore of the Kansas Highway Patrol was on routine patrol on I–70 in Lincoln, County, Kansas, when he observed a Toyato Tercel traveling in the opposite direction in excess of the speed limit. Trooper DeVore's radar indicated that the vehicle was traveling at 75 m.p.h., five miles over the posted speed limit. Trooper DeVore turned around at the next opportunity to pursue the Tercel.

As Trooper DeVore pulled in behind the vehicle, he noticed that it bore California tags. Trooper DeVore also noticed that another vehicle, a white minivan, also bearing California tags appeared to be traveling with the Tercel. Trooper DeVore observed the white minivan drive onto the shoulder—another violation of Kansas law. Pulling up to the side of each vehicle for officer safety and to determine whether any other violations, like possessing an open container, or failing to wear a seatbelt or use a child restraint, were occurring, Trooper DeVore noticed that the driver of each vehicle appeared to be Hispanic. Based upon his assessment that the two cars were traveling together and his determination that the drivers of both vehicles had committed traffic infractions, Trooper DeVore stopped both automobiles.

Trooper DeVore first approached the Tercel driven by Garcia. Trooper DeVore asked the driver, Garcia, for his driver's license. Garcia presented a California identification card.[4] In response to Troop-

4. While talking with the driver of the white van, Trooper DeVore learned that Garcia did

er DeVore's question, Garcia indicated that the Tercel he was driving belonged to "a friend." Again in response to Trooper DeVore's question, Garcia stated that he was traveling with the white van that had also pulled off and that they were coming from Los Angeles and were going to Wichita to visit his wife's family. According to Garcia, the occupants of the two vehicles traveling together were "his buddies and friends and family." The van was accompanying the car in case something happened to the car. As for Garcia's travel plans, they were confused and uncertain but Trooper DeVore understood that Garcia and friends and family would being staying in Wichita for about a month, although his buddies might go back to California in a week or two. Garcia indicated that this vacation was in part possible because his thirteen-year-old step-son, who was in the car, was on vacation from school for two months. That statement seemed odd to Trooper DeVore as it was the month of October and children are usually just beginning to attend school in the fall. Trooper DeVore believed that Garcia's level of anxiety elevated during his conversation and that he seemed very nervous.

During this initial conversation, Trooper DeVore informed Garcia that he had stopped him for driving 75 m.p.h. in a 70 m.p.h. zone as indicated on his radar. Garcia initially indicated that he thought he was going within the speed limit, but subsequently apologized for speeding.

Although pressed two more times for the name of the owner of the vehicle, Garcia was unable to provide that person's identity or any proof that he validly possessed the vehicle. A computer check indicated that the vehicle was registered to a Francisco Fausto in California and that it was not reported stolen. From his own experience, however, Trooper DeVore had encountered persons who were unable to account for their possession of a vehicle that was not reported stolen but subse-

quently learned that it was. Garcia indicated that the driver of the white van, Jaime, had rented the van.

Trooper DeVore then approached the minivan to talk with its driver. The driver of the vehicle was named Jaime Mendoza. Mendoza stated that he was going to Wichita for a short stay—possibly a week. Mendoza indicated that a guy named "Joe" who was not present was the person who had rented the mini-van. Trooper DeVore believed the travel itineraries of the two vehicles traveling in tandem to be inconsistent. Trooper DeVore was given a copy of the rental agreement. No one in the van was an authorized driver. The rental agreement indicated that the vehicle was not to be taken outside of California. Mendoza was somewhat evasive when responding to questions as to whether he knew anyone in the Tercell. Mendoza indicated that he had left his immigration "green card" at home. None of the four occupants of the minivan had identification.

Based upon his interactions with the occupants of the two vehicles and the information he learned from those encounters, Trooper DeVore immediately suspected that criminal activity was afoot. At 12:02 p.m. Trooper DeVore called for Trooper Heim for backup. In addition to asking for backup, Trooper DeVore knew that Trooper Heim had his drug detection dog.

At 12:15 p.m., Trooper DeVore asked Mendoza for permission to search the minivan. Believing it safer to wait for a second trooper to arrive before conducting the search, Trooper DeVore simply waited for Trooper Heim. Trooper Heim arrived at around 12:30 p.m. The troopers first approached the Tercel. Without telling Garcia that he was free to go,[5] Trooper DeVore returned Garcia his paperwork. Trooper DeVore gave Garcia a verbal

not have a valid driver's license as his license had either been suspended or revoked.

5. Trooper DeVore testified that he would not have permitted Garcia to leave even if he had not consented to the search. Garcia, however, was not told that he was not free to leave.

warning for speeding. Trooper DeVore asked Garcia for consent to search the Tercel. Garcia granted consent to search the vehicle. Garcia and his family got out of the car as requested and handed the key to the auto to Trooper DeVore.

Jake the drug sniffing dog alerted during his inspection of both vehicles. With Trooper Heim's guidance, Jake actually climbed into the passenger compartment of the Tercel to perform his search. Trooper Heim located a small piece of green leafy vegetation that tested positive for marijuana in the Tercel. Garcia denied that he had been smoking marijuana, but conceded that the owner of the vehicle probably had.

Underneath the vehicle, troopers noticed marks on the gas tank. The straps and clamps on the tank looked newer on the tank side of the car; the gas tank also appeared to have been taken off and placed back on. From his training and experience in drug interdiction, Trooper DeVore knew that these were indications of a false compartment used to transport contraband or money.

At that point, Garcia was read the *Miranda* warnings, although he was told he was not under arrest at that time. Trooper DeVore then used a fiber optic scope to search the interior of the gas tank. From his observations, Trooper DeVore believed that the tank contained a false compartment. Garcia and Mendoza were permitted to drive the vehicles to the Salina headquarters. The gas tank to the Tercel was removed and a box style compartment in the top of the gas tank containing several bundles of a substance later determined to be methamphetamine.

When confronted with the troopers' discovery, Garcia indicated that he did not know anything about the drugs. Garcia was again read his rights but chose not to remain silent or request the presence of an attorney. Garcia denied knowledge of illegal activities, but did indicate that the Tercel belonged to a friend named "Pancho," but did not know Pancho's last name.

Trooper DeVore informed Garcia that he was facing serious charges and that "he'd be looking at some long time in jail." Trooper DeVore exhorted Garcia to tell the truth, indicating that he would charge "everybody" in the two vehicles with possession with intent to distribute the drugs. Trooper DeVore testified that he "told [Garcia] the cold, hard facts if I have to put his wife in jail, that his son will have to go to SRS." At that time, Garcia did not provide information. Trooper DeVore also showed Garcia a file from a case in which the drug trafficker had not cooperated with the government and had received a lengthy sentence. Garcia, his wife and the other occupants of the two cars were taken into custody. Garcia's step-son was temporarily placed in custody of the Juvenile Intake Authority for Salina.

On Monday, October 5, 1998, drug task force agents Ray Bailiff and Sal Molina interviewed Garcia and the others persons detained. Garcia was again advised of his *Miranda* rights. After receiving his rights, Garcia stated that he alone was responsible for the drugs in the Tercel. Garcia indicated that he wanted to cooperate with law enforcement, but that he wished to consult with an attorney first. Garcia was taken before a state judge who appointed a local attorney.

A few hours later, Garcia, represented by counsel, admitted that he was hauling drugs for a dealer in California and that he had made three prior trips to the Midwest to deliver narcotics. Prior to being intercepted by Trooper DeVore, Garcia was bound for Emporia, Kansas.

On October 16, 1998, members of the Kansas City DEA task force attempted to use Garcia and the information he had provided in making a controlled delivery. This attempt was unsuccessful. This failure was primarily due to the fact that during the initial traffic stop, Garcia had been on the cellular telephone with someone who is a friend of the drug dealer. This fact, coupled with the three day delay in making the intended delivery, tipped off

the intended recipients. During a telephone call to make the controlled delivery, the dealer referred to Garcia as a snitch. Based upon the agents' collective belief that a controlled delivery was no longer possible, the attempt to make the delivery was canceled.

### Initial Stop

██ The court finds that the initial stop of Garcia's vehicle for speeding and changing lanes without making a signal was lawful. The court rejects the defendant's claim that the stop was racially motivated and that it was not based upon the observance of one or more traffic violations. The court credits Trooper DeVore's testimony that the defendant was traveling at a rate of speed in excess of the lawful limit and that the defendant illegally changed lanes without activating his turn-signal. Garcia even apologized to Trooper DeVore for speeding. Consequently, Garcia's motion to suppress the fruits of the subsequent search of the vehicle based upon his contention that initial stop of his vehicle was illegal is denied.

### Subsequent Detention

██ Based upon the information gleaned from his conversations with the drivers and occupants of the two vehicles, Trooper DeVore had reasonable suspicion to detain the two vehicles in order to perform a canine sniff of both vehicles and to perform the consensual search on the white minivan. During his testimony, Trooper DeVore listed the following facts which he believed, based upon his knowledge, training and experience, provided reasonable suspicion to detain Garcia (and the other occupants of the two vehicles) for a short period of time to obtain the assistance of the drug dog and another trooper for backup: (1) The driver of the Tercel, Garcia, did not have a driver's license; (2) Garcia was traveling from Los Angeles, a major source of drugs to another metropolitan area which consumes drugs; (3) The owner of the vehicle is not present, and despite repeated inquiries Garcia is unable or unwilling to identify the owner by name; (4) Garcia had a cellular phone

in his vehicle; (5) Garcia's wife did not appear to be the age that Garcia indicated; (6) Garcia's travel plans were untenable and inconsistent with the travel plans of the persons following him in the minivan; (7) Garcia (and other persons in the two vehicles) was unusually nervous and avoided eye contact with Trooper DeVore; (8) The person who rented the minivan was not present and the rental papers indicated that the vehicle was not to leave the State of California; (9) No one in either vehicle has proof that they lawfully possessed the vehicle in which they were traveling; (10) Drug traffickers often use rental vehicles to blend in with other motorists and to avoid tying themselves to the crime.

The court will discuss the relevance of these factors identified by Trooper DeVore both singularly and in combination.

### *Lack of a Driver's License*

██ In general, the "lack of identification does not automatically create a reasonable articulable suspicion of criminal activity, but rather is only a factor to be considered." *United States v. Green*, 52 F.3d 194, 199 (8th Cir.1995). In the context of a traffic stop, driving on a suspended license or without verification of insurance are factors supporting reasonable suspicion. *Hunnicutt*, 135 F.3d at 1349 (*citations omitted*); *see Jones*, 44 F.3d at 872 (an officer may detain a driver until assured that the driver's license is valid and the driver is legitimately operating the vehicle).

Because he did not have a valid driver's license or proof of insurance, Garcia could obviously not be lawfully operating the vehicle in Kansas *See* K.S.A. 8–262 (unlawful to drive on a revoked or suspended license); K.S.A 1998 Supp. 40–3104 (unlawful to knowingly drive an uninsured motor vehicle on a public highway); K.S.A. 40–3106 (nonresident may not operate an uninsured motor vehicle on a public highway). Although not argued by the government, when Trooper DeVore discovered that Garcia was driving on a suspended license, he had probable cause to arrest

Garcia. *See United States v. Shareef*, 100 F.3d 1491, 1507 (10th Cir.1996). Combined, these are circumstances obviously supporting reasonable suspicion to detain Garcia.

### Proof of Ownership of the Vehicle

The Tenth Circuit has noted that "[o]ne recurring factor supporting a finding of reasonable suspicion ... is the inability of a defendant to provide proof that he is entitled to operate the vehicle he is driving." *United States v. Gonzalez–Lerma*, 14 F.3d 1479, 1484 (10th Cir.1994); *accord United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir.1994) ("[D]efining characteristic of our traffic stop jurisprudence is the defendant's lack of ... some ... indicia of proof to lawfully operate and possess the vehicle in question, thus giving rise to objectively reasonable suspicion that the vehicle may be stolen.") (listing Tenth Circuit cases).

In this case, Garcia was either unable or unwilling to identify the owner of the vehicle he had driven half-way across the United States. Moreover, no one in the van following in tandem with Garcia could prove that they lawfully possessed the vehicle at all, let alone the fact that the rental papers indicated that the van was not to leave California. That no one could prove lawful possession of either vehicle is a circumstance clearly supporting reasonable suspicion.

### Nervousness

The Tenth Circuit has "repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on ... nervousness ... 'must be treated with caution.'" *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir.1994) (*quoting United States v. Millan–Diaz*, 975 F.2d 720, 722 (10th Cir.1992)). Nervousness alone cannot support reasonable suspicion of criminal activity. *See id.* at 880. This is because it is common for most people "to exhibit signs of nervousness when confronted by a law enforcement officer" whether or not the person is currently engaged in criminal activity. *Wood*, 106 F.3d at 948. Thus, absent signs of nervousness beyond the norm, we will discount the detaining officer's reliance on the detainee's nervousness as a basis for reasonable suspicion. *See id.*

*United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir.1998).

The court credits Trooper DeVore's testimony that Garcia's nervousness and evasiveness were beyond the norm expected in a routine traffic stop. Although not sufficient to support a finding of reasonable suspicion, Garcia's abnormal degree of nervousness is a circumstance supporting reasonable suspicion. *See United States v. Garrett*, 47 F.Supp.2d 1257 (D.Kan.1999).

### Inconsistent Travel Plans

Unusual or suspicious travel plans may give rise to reasonable suspicion. *United States v. Beck*, 140 F.3d 1129, 1139 (8th Cir.1998) (*citing Wood*, 106 F.3d at 946–47 ("unusual travel plans may provide an indicia of reasonable suspicion"); *United States v. Kopp*, 45 F.3d 1450, 1453 (10th Cir.) (finding that suspicious travel plans, inconsistent answers, and nervousness were sufficient to constitute reasonable suspicion), *cert. denied*, 514 U.S. 1076, 115 S.Ct. 1721, 131 L.Ed.2d 579 (1995)).

Garcia's travel plans were not only internally inconsistent with themselves, but were clearly inconsistent with the travel itinerary of his travel companions in the minivan. Mendoza was initially somewhat vague as to whether he even knew anyone in the Tercel. As the case law makes clear, one of the hallmarks of drug trafficking is the inability of it the enterprise's participants to get the travel plans straight. In this case, the inexplicable and glaring inconsistencies between the travel plans of the two groups of persons traveling together is a circumstance supporting reasonable suspicion.

### Source State

After an extensive analysis of the issue, this court recently concluded that the fact that the defendant departed from a source state or city, whether or not concealed by the defendant, is a circumstance supporting reasonable suspicion, but is not by itself sufficient to sustain that finding. *See United States v. Garrett,* 47 F.Supp.2d 1257 (D.Kan.1999). That Garcia departed from Los Angeles, California, a known source of narcotics, is a circumstance supporting reasonable suspicion, but is not by itself sufficient to sustain that finding.[6]

### Cellular Phone and Rental Vehicle

Although cellular telephones are obviously lawfully used and possessed by a wide segment of the population, as the Tenth Circuit has stated, and as this case anecdotally confirms, "a cellular phone . . . is a recognized tool of the trade in drug dealing." *United States v. Slater,* 971 F.2d 626, 637 (10th Cir.1992).

Similarly, while cars and other vehicles are routinely rented for a myriad of lawful purposes, use of a rental vehicle to transport drugs provides several advantages to the narcotics distributor. Among other things, using a rental vehicle avoids the chance of tying the owner of the vehicle to the drugs if discovered. The presence of drug forfeiture laws also creates an incentive to use a rental vehicle. *See United States v. Figueroa–Lopez,* 125 F.3d 1241, 1244 (9th Cir.1997) (use of a rental car was consistent with the practices of an experienced drug trafficker), *cert. denied,* —— U.S. ——, 118 S.Ct. 1823, 140 L.Ed.2d 959 (1998). Of course, in this case, no one in the minivan could prove that they even lawfully possessed the rental vehicle.

In any event, while these facts concerning the presence of a cellular phone and the use of a rental vehicle would, either singularly or combined, add little to the reasonable suspicion calculus, they are relevant facts to consider in determining whether Trooper DeVore had reasonable suspicion to detain Garcia.

### Combination of all Factors

Based upon the numerous factors indicating that criminal activity—namely drug trafficking—was taking place, it is clear that Trooper DeVore had reasonable suspicion to detain Garcia and the Tercel while he waited for backup and the arrival of the drug dog. Although Trooper DeVore could have initiated the search of the minivan at the moment he received consent from Mendoza, given the number of persons in the two vehicles, Trooper DeVore's decision to wait for backup and a drug dog is facially reasonable. Moreover, given that Garcia did not have a valid license, Trooper DeVore could not lawfully have permitted Garcia to drive the vehicle. Contrary to the defendant's suggestion, given the information known to him amounting to reasonable suspicion, Trooper DeVore was not obligated to release the Tercel to any other person in the Tercel who might have possessed a valid driver's license. This is particularly true given the fact that the troopers could have simply impounded the vehicle at that time. *See Hunnicutt,* 135 F.3d at 1350 (officers justified in impounding vehicle because no one had authority to drive it or verification of insurance).

In sum, the court concludes that Trooper DeVore had probable cause to arrest Garcia for driving on a suspended license, and in the alternative, that Trooper DeVore had reasonable suspicion to detain Garcia until backup and the drug dog arrived. The court also finds that the approximate 40 minute delay between the initial stop and the arrival of the drug dog and backup was not unreasonable.

---

**6.** In this case, the court would find that Trooper DeVore had reasonable suspicion to detain Garcia, whether or not he knew that the defendant departed from a known source city.

## Consent to Search

The defendant's brief in support of his motion to suppress primarily challenges the lawfulness of the stop and his subsequent detention. The memorandum makes no specific challenge to the voluntariness of his consent to search the Tercel. Nor did counsel press the issue in her arguments to the court. The court deems the defendant's failure to address the issue as a concession that if his detention following the initial stop was lawful, his consent to search was voluntary.

 Assuming, *arguendo*, that the defendant does not concede that his consent to search was voluntary and that it is necessary for the court to rule on the issue, the court, based upon its review of the videotape of the stop, and having considered the testimony presented at the suppression hearing, concludes that Garcia's consent to search the Tercel was in fact voluntary. Trooper DeVore simply asked for permission to search the vehicle and Garcia consented. At the time Trooper DeVore requested consent to search, Garcia was not under arrest, was not handcuffed, and no weapons were displayed by either trooper. At the time Trooper DeVore requested consent to search, Garcia was lawfully detained for further inquiry and could have even been placed under arrest for driving on a suspended license. "The fact that officers do not specifically inform an individual that he or she has the right to refuse to consent to a search does not render that search coercive." *United States v. Davis*, 40 F.3d 1069, 1078 (10th Cir.1994), *cert. denied*, 514 U.S. 1088, 115 S.Ct. 1806, 131 L.Ed.2d 732 (1995). Under the totality of circumstances, Garcia's consent to search the Tercel was voluntary.

## Probable Cause to Arrest

 Even in the absence of the other information known by the troopers, once the drug dog alerted on the two vehicles, the troopers had probable cause to arrest Garcia and the other occupants of the two vehicles. *See United States v. Shayesteh*, 166 F.3d 349, 1998 WL 839083 (10th Cir. 1998) ("An alert by a certified narcotics sniffing dog provides probable cause for a search and arrest.") (*citing United States v. Williams*, 726 F.2d 661, 663 (10th Cir.), *cert. denied*, 467 U.S. 1245, 104 S.Ct. 3523, 82 L.Ed.2d 830 (1984)), *cert. denied*, —— U.S. ——, 119 S.Ct. 1347, 143 L.Ed.2d 510 (1999).

The court denies the defendant's motion to suppress.

## 3) Motion to Suppress Statement (Dk.29).

In the event that his motion to suppress based upon an illegal stop or unlawful detention is not granted, the defendant nevertheless seeks to suppress his post-arrest statements, arguing that his statements were involuntary and the product of coercive police tactics. Specifically, the defendant contends that in his presence, officers told his stepson, a mentally challenged boy, "that his mother was going to prison for twenty years, where she would be killed." Garcia also claims that he was told that if he did not cooperate his wife would be held in jail and that his stepson would be put up for adoption. Garcia also contends that he believed that by cooperating with the government, he would not be prosecuted by the federal government.

The government denies that the defendant was threatened or that improper promises were made to the defendant in exchange for his statement. The government notes that the defendant was represented by counsel during the entire interview in which he decided to confess his guilt and to cooperate with the government.

## Legal Standards

 The government cannot use a defendant's statement stemming from custodial interrogation unless it proves the prior use of procedural safeguards. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The requirement of a *Miranda* warning is triggered by custodial interrogation, that is,

"the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *United States v. Perdue,* 8 F.3d 1455, 1463 (10th Cir.1993). As soon as the suspect "has been deprived of his freedom of action in any significant way," *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602, or has his freedom limited to a "degree associated with formal arrest," *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), the suspect is considered to be in "custody." *United States v. Perdue,* 8 F.3d at 1463. Consequently, a defendant upon arrest must be advised of his rights before law enforcement officers began interrogation.

For purposes of *Miranda,* interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). It is said that "*Miranda* applies only if an individual is subject to 'either express questioning or its functional equivalent.'" *United States v. Davis,* 40 F.3d 1069, 1078 (10th Cir.1994) (*quoting Rhode Island v. Innis,* 446 U.S. at 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297), *cert. denied,* 514 U.S. 1088, 115 S.Ct. 1806, 131 L.Ed.2d 732 (1995). "Volunteered statements of any kind are not barred by the Fifth Amendment." *Miranda,* 384 U.S. at 478, 86 S.Ct. 1602. Thus, absent a showing of coercion or other misconduct by law enforcement, an arrestee's volunteered statements made before receiving the *Miranda* warning may be used against him. *Rhode Island v. Innis,* 446 U.S. at 300–02, 100 S.Ct. 1682, 64 L.Ed.2d 297.

A suspect who has been informed of his *Miranda* rights "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. The burden rests with the government to prove a valid waiver by a preponderance of the evidence. *Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. Amos,* 984 F.2d 1067, 1074 (10th Cir.1993). A court may find a proper waiver "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).[7] Once the defendant validly waives his *Miranda* rights, interrogation may continue until the defendant invokes his rights or changed circumstances suggest the responses have become involuntary. *United States v. Abreu,* 730 F.Supp. 1018, 1030 (D.Colo.1990), *aff'd,* 935 F.2d 1130 (10th Cir.), *cert. denied,* 502 U.S. 897, 112 S.Ct. 271, 116 L.Ed.2d 224 (1991).

Even when a defendant's *Miranda* rights are not violated, the court must still conduct a Fifth Amendment inquiry into the voluntariness of any statements. *United States v. Roman–Zarate,* 115 F.3d 778, 783 (10th Cir.1997). "[A] defendant's statement that is extracted or induced by threats or promises is involuntary." *United States v. Hernandez,* 93 F.3d 1493, 1503 (10th Cir.1996) (*citing Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203–04, 50 L.Ed.2d 194 (1976)). "Incriminating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne are coerced confessions running afoul of the Fifth Amendment...." *Griffin v.*

---

7. A court must satisfy itself of two things before finding a valid waiver of Miranda rights:

"First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."

*Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

*Strong,* 983 F.2d 1540, 1543 (10th Cir.1993) (*quoting United States v. Short,* 947 F.2d 1445, 1449 (10th Cir.1991), *cert. denied,* 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992)).

 "Coercion may involve psychological threats as well as physical threats." *United States v. Finch,* 998 F.2d 349, 356 (6th Cir.1993). Unfounded "threats to arrest members of a suspect's family may cause a confession to be involuntary." *Id.* (*citing Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961)). *See Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (threats to a defendant mother, unsophisticated in criminal law, that state financial aid to her infant children would be cut off and her children taken from her if she failed to cooperate rendered her confession involuntary).

 However, merely exhorting the defendant to start telling the truth does not render his confession involuntary. *United States v. Bailey,* 979 F.Supp. 1315, 1318 (D.Kan.1997). *See United States v. Chalan,* 812 F.2d 1302, 1307 (10th Cir. 1987) (defendant's confession was voluntary despite law enforcement officer's exhortations to tell the truth), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988); *United States v. Morgan,* 911 F.Supp. 1340, 1350 (D.Kan.1995) (mere exhortations by law enforcement officers to tell the truth are not sufficient to render a defendant's statements involuntary). Informing the defendant that his only chance to cooperate with the police would be to make truthful statements does not render his confession involuntary. *Cf. Glover,* 104 F.3d at 1582 ("A promise to bring any cooperation on the part of the defendant to the [court's] ... attention does not constitute a coercive promise sufficient to render any subsequent statements involuntary and inadmissible.") (quoting *United States v. Baldacchino,* 762 F.2d 170, 179 (1st Cir.1985)). Similarly, "promises to mention cooperation to the United States Attorney do not invalidate a subsequent confession." *United States v. Barnett,* 814

F.Supp. 1449, 1456 (D.Alaska 1992). "[N]or do threats to do what the agents have a legal right to do (*i.e.,* bring the defendant to trial and seek a conviction and a realistic penalty), *see United States v. Crespo de Llano,* 838 F.2d 1006, 1015–16 (9th Cir.1987)" render a confession involuntary. *Id.*

 It is well established that the Fifth Amendment protects against the admission of incriminating statements of all kinds, whether considered to be confessions or not. "No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any matter; it does not distinguish degrees of incrimination." *Miranda v. Arizona,* 384 U.S. 436, 476, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966). " 'The privilege afforded not only extends to answers that would in themselves support a conviction ... but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute....' " *Malloy v. Hogan,* 378 U.S. 1, 11, 84 S.Ct. 1489, 1495, 12 L.Ed.2d 653 (1964) (*quoting Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951)). " '[T]he availability of the privilege ... [turns] upon the nature of the statement or admission and the exposure it invites.' " *United States v. Rogers,* 921 F.2d 975, 979 (10th Cir.) (*quoting In re Gault,* 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967)), *cert. denied,* 498 U.S. 839, 111 S.Ct. 113, 112 L.Ed.2d 83 (1990); *see also Cooper v. Dupnik,* 963 F.2d 1220, 1236–38 (9th Cir.) (statements which could and probably would have been used against accused had he gone to trial in order to hinder any insanity defense were made in contravention of accused's right to remain silent), *cert. denied,* 506 U.S. 953, 113 S.Ct. 407, 121 L.Ed.2d 332 (1992). "A coerced or involuntary statement, which violates a suspect's rights under the Fifth Amend-

ment, is not admissible at trial for any purpose." *United States v. Guerro*, 983 F.2d 1001, 1003 (10th Cir.1993).

■■■ The court looks to the totality of the circumstances in determining whether the statements were voluntary. *United States v. Glover*, 104 F.3d at 1579. Specific factors relevant in this determination include: the age, education, and intelligence of the defendant; the length of detention and questioning; whether Miranda warnings were given; the defendant's physical and mental characteristics; and the location of the questioning. *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir.1987), *cert. denied*, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988); *see United States v. Short*, 947 F.2d 1445, 1449 (10th Cir.1991), *cert. denied*, 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992). "In no case, however, is any single factor determinative." *Chalan*, 812 F.2d at 1307.

■■■ In deciding if the waiver was intelligent, the court looks at whether "the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him." *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir.1990) (citation omitted), *cert. denied*, 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991). The defendant need not appreciate "the tactical advantage of remaining silent" for the waiver to be intelligent. *Id.* The Supreme Court has "never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.'" *Connecticut v. Barrett*, 479 U.S. 523, 530, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) (*quoting Oregon v. Elstad*, 470 U.S. 298, 316, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)).

## Analysis

■■■ Under the totality of circumstances, the court finds that the defendant's confession was the product of a knowing and voluntary waiver of his right to remain silent. The court also finds that the defendant's statements were not the product of government coercion, threats or unfulfilled promises. The court finds the troopers' version of the events occurring during their interrogation of the defendant to be more credible than the defendant's own account. The court rejects the defendant's testimony that troopers made threats that Garcia's family would be in jeopardy while incarcerated in jail or prison. The court also rejects the defendant's claim that troopers threatened Garcia with the possibility of placing his son up for adoption or similar allegations.

That the defendant was represented by counsel who was present at the time he made the incriminatory statements to law enforcement officers clearly supports the conclusion that his statements were the product of his knowing and intelligent waiver of his right to remain silent. The incarceration of Garcia's family and friends was not an improper interrogation, but instead a reasonable action in light of the information known to officers at the time of their actions.

All promises made by the troopers were fulfilled according to their terms. The benefits promised by the troopers were conditioned on Garcia's successful completion the controlled delivery. Unfortunately for the defendant, his own actions—indirectly informing his drug source that he was being stopped by law enforcement officers and delaying his decision to cooperate—precluded him from cooperating with the government, making the controlled delivery and receiving the benefit of the bargain he had made.

The defendant's motion to suppress his post-arrest statements is denied.

IT IS THEREFORE ORDERED that the defendant's Motion to Preserve Evidence (Dk.9) is denied in part as moot and granted in part as set forth in the body of this opinion.

IT IS FURTHER ORDERED that the defendant's Motion and Memorandum in Support of Motion to Suppress Evidence (Dk.30) is denied.

**1257**

IT IS FURTHER ORDERED that the defendant's Motion to Suppress Statement (Dk.29) is denied.

IT IS FURTHER ORDERED that the defendant's Motion to Strike (Dk.36) is denied.