**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 16 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

REYNALDO DE LA FUENTE-
RAMOS,

    Defendant-Appellant.

No. 99-6146

(D.C. No. CR-98-163-C)
(W.D. Okla.)

**ORDER AND JUDGMENT**  *

Before **SEYMOUR** , Chief Judge, **KELLY** and **HENRY** , Circuit Judges.

Reynaldo De La Fuente-Ramos was convicted after a jury trial of eight

counts of transporting aliens who had entered and remained in the United States

illegally (violations of 8 U.S.C. § 1324(a)(1)(A)(ii) and 1324(a)(1)(B)(i)) and one

count of unlawful reentry into the United States (a violation of 8 U.S.C. § 1326).

Pursuant to § 2L1.2 of the United States Sentencing Guidelines, the district court

imposed a sixteen-level upward adjustment in the offense level because Mr. De

---

*  This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

La Fuente had been previously convicted of an aggravated felony. It sentenced him to concurrent fifty-seven month terms of imprisonment on each count, followed by a two-year term of supervised release.

In this appeal, Mr. De La Fuente argues: (1) the district court erred in denying his motion to suppress; (2) his 1988 conviction for importing marijuana should not have been used to enhance his sentence; (3) the district court erred in refusing to depart downward from the Guideline range; and (4) based on his rehabilitative efforts following sentencing, he is now entitled to a downward departure. For the reasons set forth below, we affirm Mr. De La Fuente's conviction and sentence.

## I. BACKGROUND

At 1:45 a.m. on April 18, 1998, Oklahoma Highway Patrolman David Ross observed a van traveling northbound on Interstate 35 near Hefner Road in Oklahoma City. The van swerved toward the middle lane, and Trooper Ross began to follow it. According to Trooper Ross's affidavit (submitted by the government at the district court hearing on Mr. De La Fuente's motion to suppress), he then observed "[t]he van weav[ing] from lane line to shoulder line several times, touching three times." See Rec. vol. I doc. 16, Ex. 1, at 1. At trial, Trooper Ross gave a somewhat different account, stating that the van

2

"swerved across the lane line into the next lane and it also swerved onto the shoulder line." Rec. vol IV, at 41. When confronted with his affidavit on cross examination at trial, Trooper Ross stated that the affidavit and his trial testimony were consistent because "touching" the lane line and "swerving across the lane line into the next lane" are "technically" the same thing. See id.

Trooper Ross followed the van and reported its license number to the dispatcher. The dispatcher informed him that the van was registered to an individual in Carrollton, Texas and had not been reported as stolen. Trooper Ross then decided to stop the van to investigate possible drunken driving.

As he approached the van on the shoulder of the interstate, Trooper Ross noticed at least a dozen Hispanic adults in the back. The driver, Raul Paradez, produced a Texas driver's license, but he could not produce a vehicle license and registration. Trooper Ross then asked Mr. Paradez to accompany him to the patrol car, where he relayed Mr. Paradez's driver's license information to the dispatcher and began to question him.

Trooper Ross informed Mr. Paradez that he had been stopped because the van was weaving. Mr. Paradez stated that he was tired and had been driving since 5:00 o'clock on the previous evening. He said that he did not have registration or insurance because the van belonged to a company that was in the business of "transporting people." Rec doc. 16 Ex. 1, at 2. According to Trooper Ross, Mr.

3

Paradez was reluctant to provide information about his destination but eventually said that the van was headed to St. Louis. Mr. Paradez also mentioned Chicago and New York, but he did not explain which city he would travel to first. He added that the passenger in the front seat, Mr. De La Fuente, also worked for the company and might be able to provide information.

When asked about the people in the back of the van, Mr. Paradez said that they were "just people they were giving a ride to." Id at 3. He was unable to explain how many of them were going to St. Louis or the other cities. He also stated that all of the passengers had identification. When the trooper asked the passengers if they had identification, none could provide it.

Trooper Ross requested another patrolman to come to the scene. About twenty minutes after Trooper Ross first noticed the van, Lieutenant Barry Ross arrived. The two troopers then approached the van and asked the passengers if they had any identification. After the passengers stated that they had no identification, Trooper Ross requested the dispatcher to report the stop to Immigration and Naturalization Service (INS) officials. INS officials spoke to Lieutenant Ross, and one of the passengers and then requested the two patrolmen to escort the van to the INS office in Oklahoma City.

In September 1998, a federal grand jury indicted Mr. De La Fuente on ten counts of transporting illegal aliens and one count of entering the United States

4

after having been deported. Mr. De La Fuente pleaded not guilty and filed a motion to suppress the evidence discovered during the stop of the van. He challenged the initial stop as well as the continuing roadside detention during which the troopers asked questions about travel destinations and the identity of the passengers.

The district court denied the motion to suppress, as well as Mr. De La Fuente's motion to reconsider the initial ruling. In its ruling on the motion to reconsider, the court reasoned:

> [Trooper Ross] reasonably believed the weaving of the van at [that] hour of the morning could have been due to illegal driving under the impairment of an intoxicant. Based upon the trooper's observations of the passengers and their traveling conditions, combined with his 14 years of law enforcement experience, including at least eight encounters with vehicles smuggling illegal aliens, and the answers of the driver and defendant, the trooper possessed reasonable and articulable suspicion that illegal smuggling activity was present. Therefore, additional detention to investigate was not improper. To maintain defendant's view, the Court would establish that an investigative stop for a traffic violation which yielded suspected criminal activity in plain view—but unrelated to the purpose of for the stop—could not be continued in order to investigate the nature of the suspected activity. This view is not, nor could it be, the law.

Rec. doc. 30, at 3 (District Court Order, filed Nov. 30, 1998).

Prior to trial, the government dismissed two of the transportation counts with prejudice. The jury convicted Mr. De La Fuente on the remaining nine

5

counts.

In the sentencing proceedings, the government introduced a 1988 conviction in the United States District Court for the Southern District of Texas for importing approximately twelve pounds of marijuana. The government argued that this conviction constituted an aggravated felony under USSG § 2L1.2(b)(1)(A) and therefore warranted a sixteen level upward adjustment in the offense level. The district court overruled Mr. De La Fuente's objection to the upward adjustment. Although acknowledging that the commentary to USSG § 2L1.2(b)(1)(A) authorized a downward departure, the court concluded that Mr. De La Fuente's admission that he had transported illegal aliens on three prior occasions indicated that departure was not warranted. However, the court did impose a sentence at the low end of the Guideline range: concurrent fifty-seven month terms of imprisonment, followed by concurrent two year terms of supervised release.

## II  DISCUSSION

### A. Motion to Suppress

Mr. De La Fuente challenges the denial of his motion to suppress on two grounds. First, he argues that Trooper Ross lacked a reasonable suspicion that he had violated a traffic law. Second, he challenges the scope of Trooper and

Lieutenant Ross's subsequent interrogation. He maintains that, because there was no evidence that the van was stolen, the patrolmen violated his Fourth Amendment rights when they asked about travel plans and the identity of the passengers in the back of a van.

In considering the district court's denial of the defendant's motion to suppress, the district court's ultimate determination of Fourth Amendment reasonableness is subject to de novo review. United States v. Little, 60 F.3d 708, 712 (10th Cir.1995). We accept the district court's findings of fact unless clearly erroneous and consider the evidence in a light most favorable to the government. United States v. Elliott, 107 F.3d 810, 813 (10th Cir.1997).

A routine traffic stop constitutes a seizure under the Fourth Amendment. United States v. West, 219 F.3d 1171, 1175 (10th Cir. 2000). Our cases characterize such stops as investigative detentions and assess their reasonableness under the standards set forth in Terry v. Ohio, 392 U.S. 1, 19-20 (1968). We thus make a dual inquiry, asking: (1) whether the stop was "justified at its inception;" and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20.

As to the first inquiry, a traffic stop is valid under the Fourth Amendment "if based on an observed traffic violation or if an officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is

occurring." United States v. Botero-Ospina, 71 F.3d 783, 785 (10th Cir.1995) (en banc). The officer's subjective motives for stopping the vehicle are irrelevant. See id.; accord Whren v. United States, 517 U.S. 806, 813 (1996) (stating that "we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers").

As to the second inquiry, our cases hold that the officer conducting the stop may request vehicle registration and a driver's license, run a computer check, and issue a citation. United States v. Hunnicutt, 135 F.3d at 1345, 1349 (10th Cir. 1998). He or she may also ask about "travel plans . . . and the ownership of the car." United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir.1989). However, after the officer has issued the citation and the driver has produced "a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way without being subject to further delay by police for additional questioning." United States v. Lee, 73 F.3d 1034, 1039 (10th Cir.1996) (citations omitted). In two circumstances, the officer may engage in additional questioning: (1) if he or she "has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring;" (2) if the subject of the additional interrogation consents to it. United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir.1994) (citation omitted).

8

1. The initial stop

Mr. De La Fuente argues that Trooper Ross's observations of the van weaving within its lane were insufficient to justify the initial traffic stop. In support of this argument, he invokes an Oklahoma statute, a decision of the Oklahoma Court of Criminal Appeals, and several of our prior decisions.

The Oklahoma statute on which Mr. De La Fuente relies, 47 Okla . Stat. § 11-309, provides that "[w]henever any roadway has been divided into two or more clearly marked lanes for traffic . . .[a] vehicle shall be driven as nearly as practicable entirely within a single lane. Shirley v. State, 321 P.2d 981 (Okla. Crim. App. 1957), involves police officers' stop of a car on the basis of "a slight weaving motion not completely from one lane to the other." Id. at 986. The Oklahoma Court of Criminal Appeals reversed the defendant's conviction for driving a motor vehicle under the influence of intoxicating liquor, stating that from the record it "was unable to ascertain the violation of any the statutes of this state." Id. It noted that "[i]t is not uncommon for automobiles traveling a four lane highway with two lanes reserved for each direction to drive in one or the other and certainly does not violate any of the state's laws to be in the left lane next to the median for purposes of preparing to pass a vehicle or for the purposes of turning." Id. The Shirley court did not address the Oklahoma statute requiring vehicles to be driven "as nearly as practicable entirely within a single lane" (47

9

Okla . Stat. § 11-309) nor did it address the question of whether the officers had the reasonable suspicion necessary to make the initial stop under the Terry standard.

Nevertheless, the Tenth Circuit decisions on which Mr. De La Fuente relies have directly addressed the validity of traffic stops for weaving within a lane. In United States v. Lyons, 7 F.3d 973 (10th Cir. 1993), the court assessed the validity of a stop based on the officer's observation that a pickup truck had "weave[d] three to four times within its lane of the divided highway." Id. at 974. Applying our prior decision in United States v. Guzman, 864 F.2d 1512, 1515 (10th Cir. 1988), the Lyons court inquired whether "a reasonable officer would have made the stop in the absence of the invalid purpose." Lyons, 7 F.3d at 975 (citing Guzman, 864 F.2d at 1517).[1] The court concluded that a reasonable officer would not have made the stop. It criticized the officer's reliance on within-the-lane weaving as a justification for the stop:

---

[1]   Guzman has since been overruled by our decision in   United States v. Botero-Ospina, 71 F.3d 783, 785 (10th Cir.1995) (en banc). We there concluded that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." We further stated that several factors considered under the   Guzman  approach were irrelevant to determining reasonableness under the Fourth Amendment:  "whether the stop was sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop" and whether "the officer may have had other subjective motives for stopping the vehicle."   Id.

10

> We also believe [the officer's] admissions concerning the universality of drivers' "weaving" in their lanes and the commonness of people's avoiding eye contact with police officers while driving significantly undercut the rationality of using these factors as objective reasons for the legitimacy of the stop. Indeed, if failure to follow a perfect vector down the highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy.

Id. at 976. The Lyons court added that the officer's failure to make any effort to determine the driver's sobriety after effecting the stop provided an additional reason for questioning the officer's motive.

We reached a similar conclusion in United States v. Gregory, 79 F.3d 973 (10th Cir. 1996). There, an officer observed one instance in which a truck "cross[ed] two feet into the right shoulder emergency lane of [an] interstate [in Utah]." Id. at 975-76. Utah has a weaving statute similar to Oklahoma's. See Id at 978 (quoting Utah Code Ann. § 41-6-61(1)). The court concluded, however, that the officer had failed to establish a reasonable suspicion to make the stop on the basis of the weaving statute:

> We do not find that an isolated incident of a vehicle crossing into the emergency lane of a roadway is a violation of Utah law. This interpretation of Utah law has been followed by the Utah courts. . . . We agree with the Utah court which noted that the statute requires only that the vehicle remain entirely in a single lane "as nearly as practical." The road was winding, the terrain mountainous and the weather condition was windy.

11

> Under these conditions any vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway, without giving rise to a suspicion of criminal activity. The driver may have decided to pull over to check his vehicle and then have a sudden change of mind and pulled back into the traffic lane. Since the movement of the vehicle occurred toward the right shoulder, other traffic was in no danger of collision. These facts lead us to conclude that the single occurrence of moving to the right shoulder of the roadway which was observed by [the officer] could not constitute a violation of Utah law and therefore does not warrant the invasion of Fourth Amendment protection.

Gregory, 79 F.3d at 978 (citations omitted). The court also found that the officer lacked a reasonable suspicion that the driver was fatigued. Id. ("[D]riving while fatigued is not criminal activity and only if a driver is extremely fatigued can the condition constitute a danger to public safety.").

According to Mr. De La Fuente, Trooper Ross's observations were insufficient to establish a failure to drive the van "as nearly as practicable entirely within a single lane." See 47 Okla . Stat. § 11-309. He further argues that Shirley, Lyons, and Gregory establish that Trooper Ross lacked the reasonable suspicion necessary to justify the traffic stop under the Fourth Amendment.

We are not persuaded by this argument. Although the contrast between Trooper Ross's affidavit and his trial testimony suggests that he may have exaggerated the extent of the van's weaving in the later instance, even the lesser degree of weaving described in the affidavit (i.e., the van's touching the lane line

12

three times, see Rec. vol. I doc. 16, Ex. 1, at 1), supports the district court's conclusion that Trooper Ross possessed the necessary reasonable suspicion to make the initial stop of the van. As we noted in Gregory, one instance of weaving may be insufficient to establish that a vehicle is not being driven "as nearly as practicable" within a single lane. See Utah Code Ann. § 41-6-61(1)); 47 Okla . Stat. § 11-309. However, there was more than one instance of such weaving here.

More importantly, in this case the government has not asserted that Trooper Ross's observations establish a violation of the Oklahoma weaving statute. Instead, the government argues that the three instances of weaving observed by Trooper Ross gave rise to a reasonable suspicion that the driver of the van was fatigued or impaired. See Aplee's Supp. Br. at 11-13. That argument is foreclosed by neither Lyons nor Gregory.

As we have noted, Lyons's conclusion that officer's stop of the vehicle violated the Fourth Amendment was based on a standard that examined the officer's motive and that has since been overruled. See Botero-Ospina, 71 F.3d at 785. Moreover, there is no indication in our opinion in Lyons that the vehicle in question there actually touched the lane line, as did the van here. Compare Lyons, 7 F.3d at 974 (noting that the vehicle "weave[d] three of four times within its lane of the divided highway" with Trooper Ross's affidavit. Rec. vol. I doc.

13

16, Ex. 1, at 1 (stating that the van <u>touched</u> the lane line three times). Similarly, the facts of <u>Gregory</u> are distinguishable, as they involve only one instance of a vehicle weaving outside of its lane and road and weather conditions that could have caused even an unimpaired motorist to weave. <u>See</u> <u>Gregory</u>, 79 F.3d at 978. ("The road was winding, the terrain mountainous and the weather condition was windy.").

Moreover, in a post- <u>Botero-Ospina</u> case involving circumstances analogous to those at issue here, this circuit has concluded that an officer possessed reasonable suspicion necessary to justify the stop of a motorist. In <u>United States v. Ozbirn</u>, 189 F.3d 1194, 1196 (10th Cir. 1999), the officer observed a mobile home "drift onto the shoulder twice in less than a quarter mile." Noting that, in contrast to <u>Gregory</u>, the weather and road conditions were optimal, the court concluded that the officer possessed probable cause necessary to justify the stop for a violation of the Kansas weaving statute, <u>see</u> <u>id.</u> at 1198 (citing Kan. Stat. Ann. § 8-1522), and that the officer had a reasonable suspicion that the driver was impaired, <u>see</u> <u>id.</u> at 1199.

Just as the officer in <u>Ozbirn</u>, Trooper Ross observed the van weaving on more than one occasion. As in <u>Ozbirn</u>, the weaving was not solely within the lane. Accordingly, Trooper Ross's observations provided him with a reasonable suspicion that the driver of the van was impaired. Thus, the district court

14

properly concluded that the initial stop of the van was reasonable under the Fourth Amendment.

2. The Continuing Detention

In his pro se appellate brief, Mr. De La Fuente also challenges Trooper and Lieutenant Ross's continuing detention of the van and its occupants to ask about their travel plans and their identity. He further contends that his statements to the troopers should be suppressed as fruit of the poisonous tree—the unlawful detention.

Mr. De La Fuente's challenge to the detention is undermined by established circuit law. We have held that an officer making a traffic stop may ask about travel plans and ownership of the vehicle, see Rivera, 867 F.2d at 1263, and that, if the driver and the passenger are unable to produce a valid registration, a reasonable suspicion arises that the vehicle may be stolen, thereby justifying further inquiry, see United States v. Fernandez, 18 F.3d 874, 879 (10th Cir.1994) ("[A] defining characteristic of our traffic stop jurisprudence is [that] the defendant's lack of a valid registration, license, bill of sale, or some other indicia of proof to lawfully operate and possess the vehicle in question . . . giv[es] rise to objectively reasonable suspicion that the vehicle may be stolen.").

As the government notes, Trooper Ross's questioning of Mr. Paradez

15

continued after he was unable to produce either a valid registration or an explanation of why he did not have the required documents and as he awaited the results of the driver's license check. Trooper Ross began his questioning of the passengers in the rear of the van only after Mr. Paradez provided varying explanations of the van's initial destination and appeared unable to provide information about the passengers' destination. At that point, Trooper Ross was confronted with not only Mr. Paradez's varying explanations of the van's destination but also with his statement that the company for which he worked was in the business of "transporting people," and the presence of at least a dozen adults in the van. Those circumstances provided Trooper Ross with a reasonable suspicion of an immigration violation, thus warranting further inquiry.     See United States v. Galindo-Gonzales  , 142 F.3d 1217, 1224 (10th Cir. 1998) (concluding that the failure to produce registration papers at a border checkpoint provided justification for questions about the identity of the passengers); Gonzalez-Lerma  , 14 F.3d at 1483 (stating that an officer's "objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring" justifies additional questioning). In light of the passengers' subsequent statements that they were unable to provide identification, the continuing detention after Lieutenant Ross arrived was similarly justified. Thus, the district court properly rejected Mr. De La Fuente's Fourth Amendment

16

challenge to the scope of his detention.

## B. Mr. De La Fuente's Prior Conviction

Mr. De La Fuente challenges on two grounds the district court's use of a 1988 federal court conviction for importing marijuana. First, he argues that the conviction does not constitute an "aggravated felony" under 8 U.S.C. § 1326(b)(2). He then contends that the district court erred in applying the definition of an "aggravated felony" that was not in effect at the time of the prior conviction. These arguments are not supported by the law of this circuit.

Under § 1326(b)(2), a longer sentence may be imposed upon an alien who reenters the United States after a conviction of "an aggravated felony" (i.e., imprisonment not more than twenty years, compared to imprisonment for not more than ten years for unlawful reentry after three or more misdemeanor convictions and imprisonment for not more than two years for unlawful reentry absent a criminal record). The definition of an "aggravated felony" set forth in 8 U.S.C. § 1101(a)(43) includes "illicit trafficking in a controlled substance (as defined in section 802 of Title 21), including a drug trafficking crime (as defined in section 924(c) of Title 18)." 8 U.S.C. § 1101(a)(43)(B), In turn, 18 U.S.C. § 924(c) defines a drug trafficking crime to include "any felony punishable under the Controlled Substance Import and Export Act (21 U.S.C. § 951 et seq.)." 18

U.S.C. § 924(c)(2).

That definition of a "drug trafficking crime" defeats Mr. De La Fuente's first challenge to the prior conviction. As the government notes, the importation of marijuana is punishable under the Controlled Substance Import and Export Act, particularly 21 U.S.C. § 952. Thus, the district court properly concluded that Mr. De La Fuente had been convicted of a drug trafficking crime.

Mr. De La Fuente's second challenge (based on the retroactive application of the definition of an "aggravated felony") is foreclosed by this circuit's decision in United States v. Aranda-Hernandez, 95 F.3d 977 (10th Cir. 1996). There, we held that the § 1326(b)(2) aggravated felony enhancement applies to "all past aggravated felonies, regardless of the date committed." Id. at 983. We explained that the definition of the term "aggravated felony" that should be applied to a particular case is the definition in effect at the time of the unlawful reentry, rather than the definition in effect at the time the aggravated felony was committed. Application of the sentencing enhancement to past aggravated felonies does not violate the Ex Post Facto Clause because the act being punished is the reentry rather than the original felony. Id. We therefore conclude that the district court properly relied on Mr. De La Fuente's prior conviction for importing marijuana in increasing his sentence.

## C. Refusal to Depart Downward

Next, Mr. De La Fuente challenges the district court's refusal to depart downward from the Guideline sentencing range. His argument for downward departure is based on Application Note 5 to USSG § 2L1.2

Section 2L1.2 sets the offense level for unlawful entry or remaining in the United States. Section 2L1.2(a) provides for a sixteen level increase in the offense level if the defendant has been convicted of an aggravated felony. Section 2L1.2(b) provides for a four-level increase if the prior conviction was for "any other felony" or if the defendant has three or more prior misdemeanor convictions involving crimes of violence or controlled substance offenses. Application Note 5 explains that "the [relative lack of] seriousness of the aggravated felony" may justify a downward departure:

> Aggravated felonies that trigger the adjustment from subsection (b)(1)(A) vary widely. If subsection (b)(1)(A) applies and (A) the defendant has previously been convicted of only one felony offense; (B) such offense was not a crime of violence or firearms offense; and (C) the term of imprisonment imposed for such offense did not exceed one year, a downward departure may be warranted based on the seriousness of the aggravated felony.

USSG 2L1.2 comment. n. 5.

As a general rule, as long as the district court understood its authority to depart downward from the Guidelines, we lack authority to review its refusal to do so. United States v. Fagin, 162 F.3d 1280, 1282 (10th Cir.1998) ("It is well

19

settled that an appellate court lacks jurisdiction to review a sentencing court's refusal to depart from the Sentencing Guidelines when the sentencing court was aware that it had the authority to depart but declined to exercise that authority and grant the departure.").

Here, the district court's remarks at sentencing indicate that it properly understood its authority:

> The departure, under Application Note 5, is discretionary. It is not mandated by the guidelines. It's simply suggested that the prior aggravated felony, if not as serious as the others, might be considered as a reason for departure. I think it is a logical conclusion. However, in this case, it ignores the fact that Mr. De La Fuente has admitted to at least three previous acts of smuggling unlawful aliens. That admission is totally disregarded in any calculation under the guidelines and I think that is inappropriate. I think it should be regarded. It should be taken into account and I will take it into account by declining to depart downward based on the relative lack of seriousness of the previous aggravated felony.

Rec. vol. VII at 8-9 (Tr. of March 23, 1999 sentencing). Accordingly, we lack jurisdiction to review the district court's refusal to depart downward from the Guideline range.

### D. Requested Downward Departure Based on Post-Sentencing Rehabilitative Efforts

Mr. De La Fuente also argues that he is entitled to a downward departure based on the fact that he has "undergone a series of social, educational Christian

20

instructive programs that have unequivocally enhanced his self improvement" and that he has "dissociated himself from any nefarious activities and does not have any affiliation with any criminal enterprise or persons." Aplt's Pro Se Br. at 20.

In United States v. Warner, 43 F.3d 1335, 1340 (10th Cir.1994), we held that, even in an instance in which a case is remanded for resentencing, conduct of a defendant occurring after the original sentencing proceeding may not be considered by the district court as a basis for downward departure at the second sentencing proceeding. The cases on which Mr. De La Fuente relies do not contradict Warner: they involve rehabilitative efforts occurring after the commission of the offense but before the initial sentencing. See, e.g., United States v. Maier, 975 F.2d 944 (2d Cir. 1992) (concluding that defendant's post-offense, pre-sentencing rehabilitative efforts warranted downward departure); United States v. Harrington, 947 F.2d 956 (D.C. Cir. 1991) (same); see also United States v. Whitaker, 152 F.3d 1238, 1240 (10th Cir.1998) (holding that post-offense rehabilitative efforts "may provide a basis for departure").

Post-sentencing factors warranting sentencing modification are addressed by a federal statute, 18 U.S.C. § 3582 (c)(1). Section 3582 authorizes the Director of Prisons to file a motion seeking a reduction of imprisonment with the district court based on certain factors. There is no indication that the Director of

21

Prisons has filed such a motion here, and a downward departure based on Mr. De La Fuente's post-sentencing conduct is thus not warranted.

### E. Apprendi v. New Jersey

Finally **,** in a second supplemental brief, Mr. De La Fuente argues that the Surpeme Court's decision in Apprendi v. New Jersey, 120 S. Ct. 2348 (2000) indicates that the district court erred by failing to instruct the jury that it must find beyond a reasonable doubt that he had been convicted of an aggravated felony. Mr. De La Fuente acknowledges that his argument is foreclosed by the Supreme Court's prior decision in Almendez-Torres v United States, 523 U.S. 224 (1998).

The Supreme Court there held that 8 U.S.C. § 1326(b)(2) is a penalty provision that authorizes an enhanced sentence and that the government is not required to charge the fact of an earlier conviction in the indictment. However, as Mr. De La Fuente observes, one of the justices in the Almendez-Torres majority stated in a concurrence in Apprendi that the earlier case was incorrectly decided. See Apprendi, 120 S. Ct. at 2379 (Thomas, J., concurring).

Almendez-Torres has not been overrruled, and we are bound to follow it. Indeed, Mr. De La Fuente acknowledges that "relief is currently foreclosed in this court" and that he has raised the argument "in order to preserve his claim for

22

review by the United States Supreme Court." Aplt's Second Supp. Br. at 2. We therefore reject Mr. De La Fuente's <u>Apprendi</u>-based challenge to his conviction and sentence.


### III. CONCLUSION

We DISMISS for lack of jurisdiction Mr. De La Fuente's appeal of the district court's refusal to depart downward from the Guideline range. We AFFIRM the district court's denial of Mr. De La Fuente's motion to suppress, as well as his convictions and sentences.

Entered for the Court

Robert H. Henry
Circuit Judge