F I L E D
United States Court of Appeals
Tenth Circuit

APR 24 1998

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

VICTOR MANUEL GALINDO-
GONZALES,

Defendant-Appellant.

Case No. 96-2239

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CR-96-55-JP)

Albert B. Lassen, Lassen and Jaffe, Albuquerque, New Mexico, for the Defendant -
Appellant.

Charles L. Barth, Assistant United States Attorney (John J. Kelly, United States Attorney,
with him on the brief), Albuquerque, New Mexico, for the Plaintiff - Appellee.

Before **TACHA**, **HENRY**, and **LUCERO**, Circuit Judges.

**HENRY**, Circuit Judge.

Victor Manuel Galindo-Gonzales appeals the district court's order denying his motion to suppress evidence discovered after his vehicle was stopped at a roadblock. Mr. Galindo-Gonzales argues that the initial stop of his vehicle and his subsequent detention were unreasonable seizures that violated the Fourth Amendment. We disagree and affirm the district court's decision.

## I. BACKGROUND

At about two o'clock in the afternoon on January 11, 1996, Mr. Galindo-Gonzales was driving his Chevrolet Blazer north on I-25 near Las Vegas, New Mexico. He approached a roadblock on the highway and was ordered to stop. The roadblock had been established by the New Mexico State Police to ensure that motorists had valid driver's licenses, vehicle registrations, and proof of insurance. It was manned by six or seven officers.

When Mr. Galindo-Gonzales stopped, Officer Norman Martinez approached the vehicle and asked for a driver's license and vehicle registration. Mr. Galindo-Gonzales, who is a resident alien, produced a valid Kansas driver's license but told Officer Martinez that he did not have his registration with him. Following standard procedure, Officer Martinez ordered Mr. Galindo-Gonzales to move his vehicle to a secondary area on the highway shoulder so that the registration could be verified without blocking other

2

vehicles approaching the roadblock. Because Mr. Galindo-Gonzales professed to speak little English, the conversation took place in Spanish.

At the time Officer Martinez ordered Mr. Galindo-Gonzales to the highway shoulder, he had already formed the impression that the four passengers he saw in the vehicle might be undocumented Mexican aliens. He observed that the men were speaking in Spanish and had black hair and dark complexions. Rec. vol. II at 20, 34, 43 (Motion to Suppress Hr'g, dated April 10, 1996). Also, Officer Martinez had encountered four or five groups of undocumented aliens in the previous year, half of these at roadblock stops. See id. at 17. Although the roadblock was set up for the purpose of checking that motorists and their vehicles were properly licensed, Officer Martinez admitted that during stops officers look for other suspicious activity, including evidence of persons transporting undocumented aliens. See id. at 16.

Officer Martinez walked over to the shoulder where the Blazer had stopped. Before calling in the license plate number in order to determine registration information, he asked Mr. Galindo-Gonzales two questions: who the passengers were, and, when Mr. Galindo-Gonzales did not respond, whether any of the passengers had identification. Mr. Galindo-Gonzales replied that they did not. Officer Martinez admitted that his interest in the questions was in part investigatory and in part for safety concerns, because there were many persons in the vehicle. Nevertheless, Officer Martinez allowed the men to remain in the vehicle while he called in the license plate number and driver's license numbers.

3

Approximately two minutes elapsed from the time Officer Martinez began his questioning at the secondary area to the time he called in the license information. Within a few minutes, the report came back that the vehicle was indeed registered to Mr. Galindo-Gonzales. Up to this point, the encounter had lasted about ten minutes.

Although the checkpoint's initial purpose had been fulfilled once Officer Martinez confirmed that Mr. Galindo-Gonzales's documents were in order, the officer detained the party further. He requested that the passengers exit the vehicle. He then learned that rather than the four passengers he had observed in the Blazer, there were in fact six passengers, two of whom exited from the vehicle's storage area. He asked them for their names, birth dates and social security numbers. None of the passengers could provide a social security number. After further investigation, Officer Martinez's suspicions blossomed into a determination that all six were undocumented aliens, illegally in the United States. Mr. Galindo-Gonzales was arrested and charged with transporting illegal aliens and aiding and abetting, in violation of 8 U.S.C. § 1324 and 18 U.S.C. § 2.

Mr. Galindo-Gonzales then moved to suppress evidence obtained at the roadblock encounter, arguing that his detention violated the Fourth Amendment. The district court held a hearing at which Officer Martinez testified. Thereafter it issued a written order in which it denied the suppression motion. As to the initial stop, the court noted that Mr. Galindo-Gonzales had conceded that it was "a routine roadblock to check license and registration." Rec. vol. I, doc. 31, at 7 (Dist. Ct. Order, filed July 11, 1996). As a result,

4

the court concluded, the initial stop was reasonable under the Fourth Amendment. As to the subsequent questioning of Mr. Galindo-Gonzales, the court stated that Officer Martinez was not required to have had a reasonable suspicion of wrongdoing in order to ask Mr. Galindo-Gonzales about his passengers' identity.

Alternatively, the court reasoned, even if reasonable suspicion was required, it was present when Officer Martinez began questioning Mr. Galindo-Gonzales about the passengers' identity. The court cited the following factors supporting a finding of reasonable suspicion: (1) I-25 is the only north-south interstate highway in New Mexico; (2) I-25 provides the most direct continuous route from the southern part of the state near the Mexican border to Colorado and other states to the north: (3) Mr. Galindo-Gonzales's truck had dark tinted windows and was capable of carrying numerous passengers; (4) Officer Martinez noticed four male passengers with dark hair and skin who spoke Spanish; (5) Mr. Galindo-Gonzales failed to respond to Officer Martinez's first question about the passengers; and (6) Mr. Galindo-Gonzales had observed the transportation of illegal aliens at roadblock stops on several prior occasions.

After his suppression motion was denied, Mr. Galindo-Gonzales entered a conditional guilty plea, and the district court sentenced him to three years' probation.

II.  DISCUSSION

On appeal, Mr. Galindo Gonzales argues that the district court erred in denying his motion to suppress.  Although his argument is somewhat unfocused, we read his appellate brief to challenge three phases of his encounter with Officer Martinez: (1) the initial stop at the checkpoint on I-25; (2) Officer Martinez's questioning of him at the secondary area before calling the dispatcher to obtain registration information; and (3) the further detention after Officer Martinez discovered that the Chevy Blazer was registered to Mr. Galindo-Gonzales.  "In reviewing the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous."  United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997).  We review de novo the ultimate question of whether a search or seizure is reasonable, viewing the evidence in the light most favorable to the district court's determination.  See id.

### A.    Fourth Amendment Requirements for Checkpoint Stops and Subsequent Detentions

The stop of a vehicle at a fixed checkpoint constitutes a "seizure" to which the Fourth Amendment's requirement of reasonableness applies.  See Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 450 (1990); United States v. Morales-Zamora, 914 F.2d 200, 202-03 (10th Cir. 1990).  Even in the absence of individualized suspicion, a brief seizure at a checkpoint may be reasonable if conducted in a neutral manner for the

purpose of effectuating important governmental purposes. See Sitz, 496 U.S. at 450-55 (concluding that a twenty-five second detention at a checkpoint for purpose of determining drivers' sobriety was reasonable under the Fourth Amendment).

In concluding that these fixed checkpoint stops do not violate the Fourth Amendment, the Supreme Court has focused on the lack of discretion afforded the individual officers, the standardized procedures employed, and the minimal intrusion imposed on motorists. See Sitz, 496 U.S. at 453. This circuit has applied these decisions in concluding that a brief stop at a highway roadblock for the limited purpose of verifying a driver's license, registration, and proof of insurance is a reasonable intrusion into the lives of drivers and their passengers even in the absence of reasonable suspicion that an individual passenger or motorist is engaged in illegal activity. See Morales-Zamora, 914 F.2d 200, 202-03 (10th Cir. 1990) ("Assuming that the initial stop of the defendants was for the valid purpose of checking drivers' licenses, vehicle registrations, and proofs of insurance, we hold that the defendants' initial detention at the roadblock was not an unreasonable seizure under the fourth amendment.").

When an officer seeks to expand the investigation of a motorist beyond the reasons stated for the checkpoint, he or she must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Bloom, 975 F.2d 1447, 1456 (10th Cir. 1992); see also Sitz, 496 U.S. at 451 ("Detention of particular motorists for more extensive field sobriety testing [after an initial stop at a

checkpoint] may require satisfaction of an individualized reasonable suspicion standard."). "[T]he existence of objectively reasonable suspicion of illegal activity does not depend on any one factor, but on the totality of the circumstances." Wood, 106 F.3d at 946. While common sense and human experience are to be employed, see United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994), inchoate suspicions and unparticularized hunches do not provide reasonable suspicion, see United States v. Fernandez, 18 F.3d 874, 878 (10th Cir. 1994). Requiring an individualized, reasonable suspicion as a prerequisite to expanding the scope of detentions at fixed checkpoints protects motorists and passengers from random stops involving the "kind of standardless and unconstrained discretion [that] is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." Delaware v. Prouse, 440 U.S. 648, 661 (1979).

Accordingly, in order to evaluate the reasonableness of the detention of a motorist after the purpose of the initial stop has been satisfied, we conduct a two part-inquiry. First, we determine whether the detention was justified in its inception. Second, we consider whether the officer's actions were reasonably related in scope to the circumstances that justified the detention in the first place. Wood, 106 F.3d at 945 (citing Terry v. Ohio, 392 U.S. 1 (1968)). The detention must be temporary, lasting no longer than is necessary to effectuate its purpose. Id. Its scope must be carefully tailored to its underlying justification. Id.

## B. The Initial Stop

In summarizing his argument on appeal, Mr. Galindo-Gonzales states that "the real reason Officer Martinez was stopping cars was not to check documents, but to look for aliens." Aplt's Br. at 4. Although that statement suggests that Mr. Galindo-Gonzales is now challenging the initial stop of his vehicle at the checkpoint, he did not do so in the district court proceedings. There, he acknowledged that Officer Martinez and his fellow officers had "limited authority" to stop northbound vehicles on I-25 to check for licenses, registration, and insurance verification, see Rec. vol. II at 5, and he proceeded to challenge only the subsequent questioning by Officer Martinez at the secondary area.

In any event, Mr. Galindo-Gonzales cites no evidence in the record to support this new contention that the initial stop was merely a pretext to search for illegal aliens. As noted above, Officer Martinez testified that the decision to establish the roadblock was made by one of his supervisors and that every northbound vehicle was stopped in order to check drivers' licenses, registration papers, and insurance. See id. at 13-18. Although Officer Martinez did acknowledge that, during the course of these kind of roadblocks, officers also look for evidence that drivers are under the influence of alcohol or drugs, transporting illegal narcotics, or violating the immigration laws, see id. at 16, that admission does not render the initial checkpoint stop unlawful. Officers properly investigating one kind of offense are not required to ignore suspicious circumstances suggesting the commission of other kinds of offenses. See, e.g., United States v. Jones,

9

44 F.3d 860, 872 (10th Cir. 1995) (suspicious circumstances observed during a traffic stop justified officer's questions about transporting contraband); United States v. Arango, 912 F.2d 441, 446-47 (10th Cir. 1990) (same). Because the brief detention of motorists to inspect license, registration, and insurance information at an established checkpoint comports with the Fourth Amendment, see Morales-Zamora, 914 F.2d at 202-03, we conclude that the initial stop of Mr. Galindo-Gonzales's vehicle at the checkpoint was reasonable.

### C. Additional Questioning at the Secondary Area

Mr. Galindo-Gonzales next challenges Officer Martinez's questioning him about his passengers' identity at the secondary area. He argues that in order to detain him for the purpose of investigating matters other than licensing, vehicle registration, and insurance, Officer Martinez was required to have had a reasonable suspicion that Mr. Galindo-Gonzales was engaged in illegal activity According to Mr. Galindo-Gonzales, Officer Martinez lacked such a reasonable suspicion. Therefore, he contends, by asking him about his passengers' identity in the absence of a reasonable suspicion of a violation of the immigration laws, Officer Martinez violated the Fourth Amendment.

As noted, the district court rejected this argument for two reasons. First, it said, Officer Martinez did not need a reasonable suspicion to ask questions about the passengers' identity. The court characterized these questions as "more akin to brief and

10

casual conversation that is permissible after an officer makes a legitimate stop of a vehicle than to an interrogation that prolonged the detention." Rec. vol. I, doc. 31 at 12. Second, the court said, even if reasonable suspicion was required, Officer Martinez had the requisite reasonable suspicion when he asked the questions. Id. Consideration of the grounds given by the district court requires a closer examination of our precedent.

We begin with the district court's conclusion that Officer Martinez did not need reasonable suspicion when he asked the questions about the passenger's identity. In characterizing the questions as "brief and casual conversation" not requiring a reasonable, individualized suspicion of illegal activity before they could be asked, the court cited this circuit's decisions in United States v. Rivera, 867 F.2d 1261 (10th Cir. 1989) and United States v. Salinas-Calderon, 728 F.2d 1298 (10th Cir. 1984).

In Rivera, a traffic stop case in which the scope of the officer's questioning was not at issue, we stated that after observing illegal driving conduct, a police officer "could legitimately ask questions relating to the identity and travel plans of [the driver and passenger] and the ownership of the car . . . regardless of [the officer's] underlying motivation." Rivera, 867 F.2d at 1263. Thus, Rivera involved a traffic stop based on reasonable suspicion, not a checkpoint stop during which an officer allegedly expands the questioning beyond what is required to satisfy the purposes of the checkpoint.

In Salinas-Calderon, which also involved an initial stop based on reasonable suspicion, we stated that a state trooper who had made a traffic stop after observing

11

erratic driving had "general investigative authority to inquire into possible immigration violations." Salinas-Calderon, 728 F.2d at 1301 n.3. We also concluded that the trooper's questioning about a green card was reasonable under the circumstances. Id. The court in Salinas-Calderon did not hold that reasonable suspicion was not required in order to ask questions pertaining to possible immigration violations, but said that the questioning was reasonable under the particular circumstances at issue in the case. Neither Rivera nor Salinas-Calderon addresses the particular question at issue here-- whether and to what extent an officer may ask questions about passengers' identity during initial questioning at a checkpoint stop.

The district court's alternative conclusion-- that, when he asked the questions about the passengers' identity, Officer Martinez had a reasonable suspicion that Mr. Galindo-Gonzales had violated the immigration laws--is not supported by our prior decisions. According to Officer Martinez, at the time that he ordered Mr. Galindo Gonzales to the secondary area, the only factors on which he based his suspicion of an immigration violation were the passengers' dark hair and dark complexions and the fact that they were speaking Spanish. See Rec. vol. II at 43. In our view, a person's racial characteristics are insufficient to establish the reasonable suspicion necessary to justify a detention after a checkpoint stop conducted a substantial distance from the Mexican

12

border.[1]  See United States v. Martinez-Fuerte, 428 U.S. 543, 565 n.17 (1976) (noting that officers may rely on the appearance of Mexican ancestry in referring individuals to a secondary detention area at a checkpoint near the Mexican border but stating that "[d]ifferent considerations would arise if, for example, reliance were put on apparent Mexican ancestry at a checkpoint located near the Canadian border."); United States v. Lopez-Martinez, 25 F.3d 1481, 1487 (10th Cir. 1994).  ("[T]he overwhelming number of Hispanics in this country are United States citizens, not illegal aliens.").  Although the fact that the passengers were speaking Spanish may be  relevant, it too is insufficient by itself to create reasonable suspicion under the circumstances.  Officer Martinez, himself a Spanish speaker, admitted that many persons legally in the United States have dark hair and complexions and speak Spanish.  In fact, under questioning from the court, Officer Martinez appeared to concede that his impression that the passengers were Mexican nationals was no more than a hunch.  See Rec. vol. II at 43-44.

Nevertheless, we believe that in considering the justification for questioning Mr. Galindo-Gonzales about the passengers' identity, the district court ignored an important factor.  As noted, when stopped at the checkpoint, Mr. Galindo-Gonzales was unable to produce any vehicle registration document demonstrating either ownership or the right to

---

[1]    The government agreed that the Las Vegas checkpoint was more than a hundred miles from the Mexican border.  See Rec. vol. II at 55; cf.  8 C.F.R. § 287.1(a)(2) (defining "reasonable distance" from the border under 8 U.S.C. § 1357(a)(3) as "within 100 air miles from any external boundary of the United States or any shorter distance which may be fixed by the district director.").

13

operate the Chevy Blazer. In United States v. Fernandez, 18 F.3d 874 (10th Cir. 1994), Chief Judge Seymour observed that "a defining characteristic of our traffic stop jurisprudence is [that] the defendant's lack of a valid registration, license, bill of sale, or some other indicia of proof to lawfully operate and possess the vehicle in question . . . giv[es] rise to objectively reasonable suspicion that the vehicle may be stolen." Fernandez, 18 F.3d at 879-80 (collecting cases). Although the failure to produce such a proof of ownership authorizes an officer to detain a motorist while he runs a computer check to determine to whom the vehicle is registered, see United States v. Rutherford, 824 F.2d 831, 834 (10th Cir. 1987), the running of such a computer check is not the only reasonable means of investigating a possible car theft. Instead, we have concluded that officers confronted with a motorist who cannot produce proof of ownership may ask questions about the identity and travel plans of the driver and passengers.

For example, in United States v. Miller, 84 F.3d 1244 (10th Cir. 1996), a police officer stopped a van for speeding. When the driver was unable to produce registration papers or proof of insurance, the officer asked the driver a series of questions, including who owned the van and where he was going. When the driver said that he was traveling to Kansas to see his ex-wife, bring a present to his daughter, and help the passenger find a job, the officer asked how long he had known the passenger. See Miller, 84 F.3d at 1248. This circuit rejected the driver's argument that the officer's questioning violated the Fourth Amendment. See id. at 1250-51 ("The initial questioning while [the driver] was in

14

the car presents no Fourth Amendment problem."). We reasoned that in light of the driver's failure to produce registration papers or proof of insurance, the officer "had reasonable suspicion the van might be stolen, which justified further investigation." Id. at 1251.

The questions asked by the officer in Miller resemble the questions asked by Officer Martinez in the instant case. Just as the Miller driver's failure to produce registration papers justified further investigation that included questions about the passenger's identity, so Mr. Galindo-Gonzales's failure to produce registration papers justified further questioning by Officer Martinez. We acknowledge that our decisions do not set forth a definitive list of particular questions that an officer may ask a motorist when he has a reasonable suspicion that a vehicle is stolen. However, the questions asked by Officer Martinez here--who the men in the Chevy Blazer were and, after Mr. Galindo-Gonzales did not answer that question, whether the men had identification--are both sufficiently related to determining ownership of the vehicle such that it was reasonable for Officer Martinez to ask them.

We note that in his testimony at the evidentiary hearing, Officer Martinez did not invoke Mr. Galindo-Gonzales's failure to produce registration papers as a justification for asking questions about the passengers' identity. Instead, he said that he asked the questions because he suspected that the men were illegal aliens and because he was concerned about his safety. See Rec. vol. II at 35. Nevertheless, our analysis of the

15

reasonableness of Officer Martinez's questions under the Fourth Amendment is not limited by his own account of his motivation in asking them. In Whren v. United States, 116 S. Ct. 1769 (1996), the Supreme Court explained that "[n]ot only have we never held, outside the context of inventory search or administrative inspection . . . that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted to the contrary." Whren, 116 S. Ct. at 1774 (citing United States v. Villamonte-Marquez, 462 U.S. 579, 584 n.3 (1983); United States v. Robinson, 414 U.S. 218 (1973); Gustafson v. Florida, 414 U.S. 260, 266 (1973); Scott v. United States, 436 U.S. 128 (1978)). "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." Scott, 436 U.S. at 138.

Accordingly, even though Officer Martinez did not characterize his questioning about the passengers as part of an investigation of a possible car theft, the fact that Mr. Galindo-Gonzales failed to produce registration papers provided an objective justification for the questions that he actually asked. We therefore conclude that Officer Martinez had the necessary reasonable suspicion to question Mr. Galindo-Gonzales about the passengers and that, as a result, the detention of Mr. Galindo-Gonzales at the secondary area before Officer Martinez ran the computer check was reasonable under the Fourth Amendment.

16

## D. Detention after the Computer Check

Finally, Mr. Galindo-Gonzales argues that, after the computer check revealed that the Chevy Blazer was registered to Mr. Galindo-Gonzales, Officer Martinez lacked the reasonable suspicion necessary to detain him any further.  As a result, Mr. Galindo-Gonzales says, his subsequent detention while Officer Martinez questioned the passengers also violated the Fourth Amendment.  Mr. Galindo-Gonzales cites cases holding that "once it is determined that the driver possesses a valid license and is entitled to operate the vehicle, the driver must be free to leave."  Aplt's Br. at 6 (citing United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995); United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir. 1988)).

We are not persuaded by this argument.  To be sure, the computer check established that the Blazer was registered to Mr. Galindo-Gonzales.   Thus, after receiving that information, Officer Martinez no longer had a reasonable suspicion that the vehicle was stolen.  However, Officer Martinez was still confronted with circumstances suggesting that Mr. Galindo-Gonzales might be transporting illegal aliens.  In particular, Officer Martinez had observed a group of men who spoke Spanish exclusively, whose identity Mr. Galindo-Gonzales refused to disclose, and who, according to Mr. Galindo-Gonzales, did not have any identification papers themselves.  Given the totality of circumstances, we conclude that Officer Martinez had the reasonable suspicion necessary

17

to continue to detain Mr. Galindo-Gonzales in order to investigate a possible violation of the immigration laws. See United States v. 1982 Ford Pickup VIN 1FTDX15G7CKA31957, 873 F.2d 947, 949 (6th Cir. 1989) (finding reasonable suspicion justifying detention after an immigration official had observed that a group of men and women stopped by the side of a highway and noting that "none of the men or women spoke English, but that each [of them] spoke Spanish with a recognizable Salvadorean accent[, that t]hey . . .wore . . . the typical dress of Central American natives[, that t]he vehicles used to transport these individuals had Texas license plates[,]" and that the individuals reported that they were going to work in a town in which illegal aliens had recently been discovered).

### III.  CONCLUSION

Accordingly, for the reasons set forth above, we AFFIRM the decision of the district court denying Mr. Galindo-Gonzales's motion to suppress.