**UNITED STATES of America,
Plaintiff,**

v.

**Ramon ROBLES, Defendant.**

No. 2:03–CR–478W.

United States District Court,
D. Utah,
Central Division.

Jan. 30, 2004.

Michael P. Kennedy, Salt Lake City, UT, for plaintiff.

David V. Finlayson, Salt Lake City, UT, for defendant.

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

WINDER, Senior District Judge.

This matter is before the court on Defendant's Motion to Suppress. On October 24, 2003, the court conducted an evidentiary hearing on the motion. Defendant Ramon Robles ("Robles") was present with his counsel, L. Clark Donaldson.[1] The government was represented by Michael P. Kennedy. Following the hearing, the court ordered a transcript as well as supplemental briefing from the parties. After thorough review and consideration of the pleadings submitted by the parties and the testimony presented at the evidentiary hearing on the motion to suppress, the court enters the following memorandum decision and order.

### BACKGROUND

The court finds the relevant facts as follows.[2] David Bairett is a sergeant with

---

1. On December 18, 2003, the court entered an Order granting the motion of L. Clark Donaldson to withdraw as counsel for the defendant and appointing David V. Finlayson as defendant's new counsel.

2. Reference to the transcript of the evidentiary hearing conducted on October 24, 2003, will be cited as "Tr. at ___."

the Utah Highway Patrol, where he has been employed for nearly eleven years. He currently is a field supervisor in the Beaver District, supervising other troopers and performing patrol duties himself. (Tr. at 7.) He has extensive training in and experience with drug investigations, and has investigated approximately 300 drug cases during his career with the highway patrol. (Tr. at 7–9.) Sgt. Bairett speaks limited Spanish. He understands some words in Spanish and uses Spanish occasionally in his work, but he does not speak Spanish fluently. (Tr. at 9–10; 45–46.)

On June 2, 2003, Sgt. Bairett was patrolling I–15 in Beaver County, Utah, when he noticed a gold Pontiac Sunfire with extremely dark-tinted windows pass him. (Tr. at 11.) Utah law requires a minimum of forty-three percent light transmittancy, and the Pontiac's windows appeared far darker. (Tr. at 11.) Sgt. Bairett initiated a traffic stop and the vehicle stopped without incident. (Tr. at 11.) A later test on the windows revealed that the side and back windows allowed only eighteen percent light transmittancy. (Tr. at 58–59; Pl's Ex. 8.)

Sgt. Bairett approached the vehicle on the passenger's side.[3] (Tr. at 13.) Upon this initial approach, he immediately noticed the overwhelming odor of air freshener. Sgt. Bairett testified that "just standing outside the window the odor was extremely strong." (Tr. at 28.) He observed that there were at least four visible air fresheners in the vehicle. (Tr. at 28, 55–57, 62–63.)[4] In his experience, there is no innocent reason for multiple air fresh-

eners, and they are used to mask another odor. (Tr. at 28, 35, 55.) Sgt. Bairett also observed a pendant of Jesus Malverde hanging from the dashboard air vent. (Tr. at 14, 20–21; Pl's Ex. 6 & 10.) Sgt. Bairett has extensive knowledge of and prior experience with the Jesus Malverde icon in relation to narcotics investigations. Sgt. Bairett explained that in his training and experience, Jesus Malverde is considered to be the patron saint for drug traffickers. (Tr. at 15.) Sgt. Bairett has encountered the icon in six or seven of about twenty major "pipeline" drug cases. (Tr. at 15–16. 52.) Sgt. Bairett also noted the presence of a cell phone. (Tr. at 28–29.)

Sgt. Bairett observed two occupants in the vehicle. The defendant, Robles, was in the front passenger seat. Sgt. Bairett requested a driver's license and registration from the driver. (Tr. at 13.) The driver produced what appeared to be a Mexican driver's license. (Tr. at 13.) Sgt. Bairett testified that it is not legal to drive in Utah solely on a Mexican driver's license. (Tr. at 14.) The defendant retrieved an insurance card from the glove box that appeared to be for the vehicle. (Tr. at 14.) While looking for the vehicle's registration, the defendant gave Sgt. Bairett a receipt for a Utah registration for a Mazda. (Tr. at 16–17.) The vehicle stopped by Sgt. Bairett, and occupied by defendant, was a Pontiac with Colorado license plates. The occupants were unable to provide a registration for the Pontiac. (Tr. at 17.)

Sgt. Bairett asked to whom the vehicle belonged. The defendant said it belonged to his girlfriend, Lupe Pacheco. (Tr. at

---

3. The events of the traffic stop were recorded on the video camera in Sgt. Bairett's patrol car. (Tr. at 11–12.) The video recording was introduced into evidence as Pl's Ex. 1.

4. Sgt. Bairett testified that "ultimately" they found approximately ten air fresheners within the vehicle. Specifically, they found "four or five disks, two cans, and three or four hanging air fresheners." (Tr. at 28.)

17–18.) The insurance card for the vehicle, which the defendant had produced, was issued in the name of Lazaro Mareno. (Tr. at 18–19; Pl's Ex. 4.) Aside from the insurance card, the occupants did not provide any documentation on the vehicle. (Tr. at 17.) Sgt. Bairett was concerned that the "subjects" were driving a car that did not belong to them, and when asked who owned the car the defendant provided a name that was different from the name on the insurance card, which was the only piece of documentation for the vehicle. (Tr. at 28.) Sgt. Bairett noted that third-party vehicles are frequently used in large drug transactions. (Tr. at 29.)

After receiving the insurance card and the driver's Mexican driver's license, Sgt. Bairett asked the driver to step out of the vehicle. (Tr. at 21.) All the conversations throughout the traffic stop between Sgt. Bairett and both subjects were conducted in a combination of broken English and broken Spanish, accentuated by hand gestures. (Tr. at 22; Pl's Ex. 1.) Although the communication was made more difficult due to language differences, Sgt. Bairett testified that when they were conversing he received "appropriate responses" to his questions, and when the occupants spoke to him in Spanish he was able to understand. (Tr. at 22.)

The driver exited the Pontiac and stood with Sgt. Bairett between the Pontiac and Sgt. Bairett's patrol vehicle. (Pl's Ex. 1.) Sgt. Bairett first asked the defendant, "Where are you going?" and then pointed northward and said in Spanish, "*Where here?*" [5] (Def's Ex. A at 1.) The defendant responded saying, "Junction," and in an attempt to clarify, Sgt. Bairett asked,

"Grand Junction?" to which the driver said "yes." (Tr. at 22.) Sgt. Bairett then asked, "*how many days in Colorado?*" (Def's Ex. A at 2.) The driver responded that he was going to be in Colorado for a month. Seeking to obtain the name of the passenger, Sgt. Bairett asked the driver, "*what is your friend's name?*" The driver correctly identified the passenger as Ramon Robles. (Tr. at 22.) Sgt. Bairett asked, "*how many years friends?*" and the driver said they had known each other since he was a small child in Mexico. (Tr. at 23; Def's Ex. A at 2, 3.) Sgt. Bairett told the driver to "wait right here," while he approached the vehicle to converse with the defendant. (Tr. at 23; Pl's Ex. 1; Def's Ex. A at 3.)

Sgt. Bairett approached the defendant, who was still in the passenger seat, and asked him to step out of the car. (Tr. at 23.) Sgt. Bairett asked the defendant the same or similar questions he asked of the driver. When speaking to the defendant, however, Sgt. Bairett was frequently able to ask his questions in English rather than Spanish. The defendant typically responded in Spanish with appropriate answers. (Def's Ex. A.) Sgt. Bairett asked the defendant, "where are you going?" (Tr. at 23; Def's Ex. A at 3.) The defendant replied, "Grand Junction." When asked how long he was going to be in Colorado, the defendant indicated three months. (Tr. at 23.) Sgt. Bairett asked the defendant how long he had known the driver or how long they had been friends and the defendant responded, "*I don't remember exactly.*" (Def's Ex. A at 4.) Sgt. Bairett asked, "a little while?" and then said "*how many years?*" (Def's Ex. A at

---

5. A transcription and translation of the video recording of the traffic stop were admitted into evidence as Def's Ex. A. Italics are used to indicate the English translation of words or sentences that were actually spoken in Spanish.

4.) The defendant responded, *"how many years? No, it hasn't been that long, not that many years."* Sgt. Bairett said, "not that long?" and then asked, *"three months? Six months?"* The defendant replied, *"more or less."* (Def's Ex. A at 4.)

Sgt. Bairett asked the defendant for his name and he replied, "Ramon Robles." Sgt. Bairett asked once again, "whose car is this?" and the defendant said, "it's my girlfriend's." (Def's Ex. A at 4.) Sgt. Bairett asked for the girlfriend's name, and the defendant stated "Lupe Pacheco." (Def's Ex. A at 4.) Sgt. Bairett asked, "How did you get the car?" and then followed up asking, "She lives in Colorado?" The defendant responded, "yes." Sgt. Bairett then asked, "And you live in Mexico?" To which the defendant responded, *"I work in Montrose but I live in Grand Junction."* (Def's Ex. A at 5.) When asked where he and the driver were coming from the defendant said *"from Mesquite,"* and indicated that they had been there for *"one day,"* staying with family.

In his initial conversation with the driver, Sgt. Bairett had failed to ask certain travel-related questions, particularly from where they were coming. Sgt. Bairett returned to the driver and asked, "Where are you coming from," and then said, pointing southward, *"Where here?"* (Def's Ex. A at 5.) The driver responded that they were coming from Mesquite. He further indicated that they had been there two or three days, and had stayed at a friend's house. (Def's Ex. A at 6.) In a later part of the conversation, he said they had been in Mesquite one-and-a-half days to two days.

Sgt. Bairett testified that the nature of the Mesquite trip caused him concern. He

was concerned that the driver and defendant had given different responses about how long they had been in Mesquite. He indicated that such discrepancies are often indicators in drug trafficking. (Tr. at 25.) He also noted that the vehicle's occupants had traveled several hundred miles from Colorado to a resort town in Nevada and had stayed for a very short period of time. (Tr. at 25.) Sgt. Bairett also noted that one of the occupants had indicated that while they were in Mesquite they stayed with family, however, the other indicated they stayed with friends. (Tr. at 29–30.)

Sgt. Bairett testified that he was also aware, based on his training and experience, that I–15 is a major north-south route through the inter-mountain west, and that this particular stretch of I–15, the area where he works, is a high-crime area for illegal drugs and other criminal activity. (Tr. at 30.)

Throughout the time Sgt. Bairett was talking to the vehicle's driver and the defendant he was repeatedly attempting to run computer checks on the vehicle. Sgt. Bairett was informed that Colorado's computer system was not operating. (Def's Ex. A at 4, 6, 7.) Sgt. Bairett continued to try to run computer checks on the vehicle during the course of the traffic stop, and asked his support staff to "keep trying off and on" to see if they could get "any response back, at least NCIC on that." (Def's Ex. A. at 7.)

Sgt. Bairett then obtained from the driver personal information which was necessary to issue a warning for the window tint. After completing the warning citation, Sgt. Bairett advised the driver that the window tint was too dark, gave him the warning citation, and returned his identifi-

cation and the insurance card.[6]

Sgt. Bairett then asked the driver, "is there anything in the car I need to know about?" and asked, *"Drugs in the car?"* (Def's Ex. A at 8.) The driver said, "no." Sgt. Bairett specifically asked, *"Not marijuana? Not the coke?"* and the driver responded, *"nothing."* (Def's Ex. A at 8.) Sgt. Bairett asked the driver for permission to search the car by saying *"I want to look for car, please,"* and then asking "That's okay?" (Def's Ex. A at 8.) The driver responded, *"si,"* and began to move toward the car, which Sgt. Bairett interpreted as moving to open the trunk. (Tr. at 33.)

Sgt. Bairett had the driver wait by the patrol car while he went to ask the defendant similar questions about contraband in the car. Sgt. Bairett asked the defendant, *"Drugs in the car?"* and again asked specifically about marijuana and cocaine. The defendant responded, *"there are no drugs."* Sgt. Bairett also asked about guns or money in the car, and the defendant responded in the negative. Sgt. Bairett then used the same phrase to ask for permission to search, saying *"I want to look for car, please. Okay?"* The defendant said yes. (Tr. at 34.)

Sgt. Bairett had the driver and the defendant wait at the front of the Pontiac, and he began to search the vehicle's interior. He observed that the paneling and seat belt bolts in the back seat appeared worn and previously removed. Accessing this area, he observed several packages of suspected contraband. Ultimately, three packages of methamphetamine, several air fresheners, a pistol, pistol magazine (clip), a box of bullets, and identification in the name of the defendant were removed from the compartment. (Tr. at 34–40.)

The driver and the defendant were arrested and transported to the Beaver County Public Safety Building. Special Agent Brent Dunlap of the Utah Department of Public Safety responded to that location to assist in the investigation and interview the driver and defendant. Agent Dunlap obtained the assistance of a Spanish-speaking employee, Reta Amezcua, to help him conduct the interview. Ms. Amezcua is Hispanic and grew up speaking Spanish. Ms. Amezcua works in the Beaver County Public Safety Building, and although interpreting is not her formal position, she is at times called to assist when an interpreter is needed. (Tr. at 69.) Ms. Amezcua is not a court-certified interpreter. (Tr. at 68–69, 77.)

Prior to asking any questions about the incident, Agent Dunlap instructed Ms. Amezcua to "go through" the *Miranda* warnings with the defendant.[7] Using a Spanish printed form, Ms. Amezcua advised the defendant of his *Miranda* rights in Spanish and the defendant said he understood. (Def's Ex. B at 3.) Agent Dunlap then asked if the defendant was willing to speak with him about the case. The defendant said he wanted to know *"what the charges are."* (Def's Ex. B at 3.) Agent Dunlap responded that he wanted to ask questions about the drugs and weapon that were found in the vehicle, and about their travel plans. (Def's Ex. B at 3.) Rather than respond to whether he was willing to speak without an attorney, the

---

6. At this point, Sgt. Bairett remained unable to ascertain or verify the registration on the vehicle through dispatch. (Tr. at 27.)

7. The interview was recorded and introduced into evidence as Pl's Ex. 9. A written transcription and translation of the interview was introduced into evidence as Def's Ex. B.

defendant responded about the items found in the vehicle saying, "*I don't know anything about that, about the [items] that were there.*" (Tr. at 70; Def's Ex. B at 3.)

Rather than follow the defendant's lead and continue talking about the items in the car, Agent Dunlap asked the defendant to clarify whether or not he was willing to speak to him without an attorney present. This time the defendant indicated that he did not know what he should do, and said he "*didn't know what would be the best.*" (Def's Ex. B at 4.) Agent Dunlap attempted, for a third time, to see if the defendant was willing to speak to him without an attorney present. At the direction of Agent Dunlap, Ms. Amezcua told the defendant: "*[Agent Dunlap] says again, to consider what it is that you want to do, if you want to speak with an attorney, without an attorney ....*" (Def's Ex. B at 4.) The defendant responded by providing substantive information about the incident rather than responding directly to the waiver of rights question. (Tr. at 71; Def's Ex. B at 5.) At that point, Agent Dunlap continued with the interview. (Tr. at 71; Def's Ex. B at 5.)

During the course of the interview, the defendant claimed no knowledge of either the methamphetamine or the pistol that was found in the vehicle. When asked about the identification documents bearing the defendant's name that were found within the hidden compartment, the defendant stated that he had lost them, did not know where they were, and had not seen them until now. (Def's Ex. B at 15.)

Agent Dunlap informed the defendant that he did not think the defendant was being truthful, and that he would like to know the truth. (Tr. at 74.) Agent Dunlap testified that at that point the defendant "just folded his arms and hung his head downwards." (Tr. at 74–75.) Agent Dunlap asked if he was afraid, and the defendant indicated he was afraid "*for everything.*" (Def's Ex. B at 19.) Agent Dunlap told the defendant that if he wanted to tell the truth, this was the time. The defendant responded saying, "*Well no, I can't say anything.*" (Def's Ex. B at 20.) Agent Dunlap concluded the interview at that point. (Tr. at 75; Def's Ex B at 20.)

On August 28, 2003, the defendant filed a motion to suppress all evidence obtained by the highway patrol as a result of the traffic stop, his detention and questioning, and the search of the vehicle.

## DISCUSSION

### I. *The Traffic Stop*

■ A routine traffic stop is a seizure within the meaning of the Fourth Amendment. *United States v. Botero–Ospina,* 71 F.3d 783, 786 (10th Cir.1995), *cert. denied,* 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996). The reasonableness of such a stop is reviewed under a two-part test set forth in *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under that test, the court must make a dual inquiry asking first whether the officer's action was justified at its inception and second whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *United States v. Williams,* 271 F.3d 1262, 1266 (10th Cir.2001), *cert. denied,* 535 U.S. 1019, 122 S.Ct. 1610, 152 L.Ed.2d 624 (2002).

### A. *The Initial Stop of Defendant's Vehicle*

■ A traffic stop "is reasonable under the Fourth Amendment at its incep-

tion if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.' " *United States v. Ramstad,* 308 F.3d 1139, 1144 (10th Cir.2002) (quoting *United States v. Ozbirn,* 189 F.3d 1194, 1197 (10th Cir.1999)). It is irrelevant whether the particular officer would have stopped the vehicle under the general practice of the police department or whether the officer may have had other subjective motives for stopping the vehicle. *United States v. McRae,* 81 F.3d 1528, 1533 (10th Cir.1996).

In this case, the defendant's vehicle was traveling north on I–15 when it was stopped by Sgt. Bairett. Sgt. Bairett stopped the vehicle after noticing that the vehicle's windows had an excessive tint, in violation of Utah Code Ann. § 41–6–149. Section 41–6–149(1)(b) provides that, with certain exceptions not relevant here, "a person may not operate a motor vehicle with ... a front side window that allows less than 43% light transmittance." A later test of the windows showed a light transmittance of only eighteen percent, well below the 43 percent requirement under Utah law. Because Sgt. Bairett had reasonable articulable suspicion of a traffic violation, the stop of the defendant's vehicle was justified at its inception.

### B. *The Detention*

■ Having determined that the traffic stop of defendant's vehicle was justified at its inception, the court must ask "whether the officer's actions during the detention were reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S.

at 20, 88 S.Ct. 1868. The Supreme Court has made clear that "an investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The defendant claims that his detention was unlawful for the following reasons: (1) Sgt. Bairett's questioning exceeded the scope of the detention; and (2) Sgt. Bairett did not have a reasonable articulable suspicion of criminal activity to justify the extended detention. (Def's Mem. In Support at xiv, xviii.)

■ "An officer conducting a routine traffic stop may run computer checks on the driver's license, the vehicle registration papers, and on whether the driver has any outstanding warrants or the vehicle has been reported stolen." *United States v. Mendez,* 118 F.3d 1426, 1429 (10th Cir. 1997). "The officer may detain the driver and his vehicle as long as reasonably necessary to make these determinations and to issue a citation or warning." *United States v. Wood,* 106 F.3d 942, 945 (10th Cir.1997); *United States v. Martinez,* 983 F.2d 968, 974 (10th Cir.1992), *cert. denied,* 507 U.S. 1056, 113 S.Ct. 1959, 123 L.Ed.2d 662 (1993). However, once the computer checks confirm that the driver has produced a valid license and proof of entitlement to operate the car, the driver must be permitted to proceed on his way, without further delay by police for additional questioning. *United States v. Anderson,* 114 F.3d 1059, 1063–64 (10th Cir.1997). Any subsequent or concurrent detention for questioning must be supported by a reasonable suspicion of criminal activity. *United States v. Jones,* 44 F.3d 860, 872 (10th Cir.1995); *United States v. Villa–*

*Chaparro,* 115 F.3d 797, 801–02 (10th Cir.) ("An investigative detention may be expanded beyond its original purpose ... if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity."), *cert. denied,* 522 U.S. 926, 118 S.Ct. 326, 139 L.Ed.2d 252 (1997).

 The standard for evaluating whether an officer could have had a reasonable suspicion of illegal activity is an objective one. *See Villa–Chaparro,* 115 F.3d at 802. Whether the subsequent detention is supported by reasonable suspicion of illegal activity does not depend upon any one factor but on the totality of the circumstances. *Jones,* 44 F.3d at 872; *United States v. Soto,* 988 F.2d 1548, 1555 (10th Cir.1993). By definition, the totality of the circumstances includes all circumstances known to the officer at the time, as well as reasonable inferences and conclusions that may be drawn by the officer. Moreover, in determining reasonableness, the officer's conduct should be viewed with " 'common sense' considering 'ordinary human experience.' " *Villa–Chaparro,* 115 F.3d at 801 (quoting *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)).

With these principles in mind, the court considers the evidence presented in this case. At the outset, the driver of the Pontiac failed to produce evidence that he was legally permitted to operate the vehicle. When asked for his driver's license the driver provided what appeared to be a Mexican driver's license. Sgt. Bairett testified that it is unlawful to drive in Utah based solely on a Mexican driver's license. In the context of a traffic stop, courts have

concluded that driving without a valid driver's license may support a finding of reasonable suspicion. *See United States v. Garcia,* 52 F.Supp.2d 1239, 1250–51 (D.Kan.1999); *see also United States v. Hunnicutt,* 135 F.3d 1345, 1349 n. 1 (10th Cir.1998) (suggesting that in the context of a traffic stop, driving on a suspended license is a factor supporting reasonable suspicion).

In addition, Sgt. Bairett immediately had reason to be concerned about the ownership of the vehicle and the authority of its occupants to possess the vehicle. The occupants were unable to produce a registration document demonstrating either ownership or the right to operate the Pontiac. Instead, they presented a registration receipt for a different vehicle.

Moreover, although they were able to provide proof of insurance for the Pontiac, the name listed on the insurance card was different from the name defendant provided when Sgt. Bairett asked who owned the Pontiac. The Tenth Circuit has stated: "a defining characteristic of our traffic stop jurisprudence is [that] the defendant's lack of a valid registration, license, bill of sale, or some other indicia of proof to lawfully operate and possess the vehicle in question ... giv[es] rise to objectively reasonable suspicion that the vehicle may be stolen." *United States v. Fernandez,* 18 F.3d 874, 879–80 (10th Cir.1994). Accordingly, these circumstances alone would have justified a limited detention to ensure the vehicle was being operated by an authorized person.

Sgt. Bairett, legitimately concerned about the vehicle's registration, acted appropriately in attempting to check the registration via computer. *See United States v. Rutherford,* 824 F.2d 831, 834 (10th Cir.1987) (providing that failure to produce such proof of ownership or authority au-

thorizes an officer to detain a motorist while he runs a computer check to determine to whom the vehicle is registered). Sgt. Bairett attempted to verify the registration through the computer system several times but was unable to get a response or verification because Colorado's computer system was not operational at the time. Nonetheless, the Tenth Circuit has provided that "the running of a computer check is not the only reasonable means of investigating a possible car theft." *United States v. Galindo–Gonzales,* 142 F.3d 1217, 1224 (10th Cir.1998). Instead, "officers confronted with a motorist who cannot produce proof of ownership may ask questions about the identity and travel plans of the driver and passenger." *Id.*

■ The Tenth Circuit has not set forth a "definitive list of particular questions" that an officer may ask when he has reasonable suspicion that a vehicle is stolen. *Id.* However, the questions asked by Sgt. Bairett in this case, i.e., the identity of the occupants, how long they had known each other, how they came to possess the vehicle, and their travel plans, were similar to questions that have been deemed appropriate in prior cases. *See, e.g., United States v. Miller,* 84 F.3d 1244, 1250–51 (10th Cir.1996) (concluding that questions asked of driver, which included who owned car, travel plans, the passenger's identity and how long he had known the passenger, were justified by concerns the car might be stolen and did not violate Fourth Amendment); *Galindo–Gonzales,* 142 F.3d at 1224 (concluding that where driver failed to produce any vehicle registration

document, officer's questions-which included questions about passengers' identity-were sufficiently related to determining ownership of the vehicle and therefore reasonable); *see also, e.g., United States v. Williams,* 271 F.3d 1262, 1267 (10th Cir. 2001) (providing that the Tenth Circuit has "repeatedly held (as have other circuits) that questions relating to a driver's plans ordinarily fall within the scope of a traffic stop"), *cert. denied,* 535 U.S. 1019, 122 S.Ct. 1610, 152 L.Ed.2d 624 (2002); *United States v. Hernandez,* 93 F.3d 1493, 1499 (10th Cir.1996) (stating that questions about travel plans are routine and "may be asked as a matter of course without exceeding the proper scope of a traffic stop"). The court concludes that Sgt. Bairett had a legitimate basis for conducting further investigation into the occupants' possession and operation of the vehicle. Additionally, the court concludes that the questions he asked were sufficiently related to determining the ownership of the vehicle [8] such that it was reasonable for Sgt. Bairett to ask them. *See Galindo–Gonzales,* 142 F.3d at 1224.

■ Having concluded that Sgt. Bairett's questions were reasonable, the court notes that the occupant's responses to Sgt. Bairett's legitimate questions did not allay his concerns, but rather increased them. It is well established that "[o]fficers properly investigating one kind of offense are not required to ignore suspicious circumstances suggesting the commission of other kinds of offenses." *Galindo–Gonzales,* 142 F.3d at 1222. In response to Sgt. Bairett's questioning, the defendant and the driver gave different answers to basic

---

8. Sgt. Bairett was not required to characterize this questioning as part of an investigation of a possible car theft. The fact that the driver and the defendant failed to produce registration papers provided an objective justification for the questions he actually asked. *Galindo–Gonzales,* 142 F.3d at 1224.

questions such as how long they had known each other, how long they had been in Mesquite, and with whom they had stayed. Incongruous answers to questions about travel plans may provide an articulable basis for a reasonable suspicion of illegal activity. *See United States v. Wood,* 106 F.3d 942, 947 (10th Cir.1997); *United States v. Kopp,* 45 F.3d 1450, 1453 (10th Cir.), *cert. denied,* 514 U.S. 1076, 115 S.Ct. 1721, 131 L.Ed.2d 579 (1995).

In addition, Sgt. Bairett's concerns about the vehicle's registration were not limited to possible car theft.[9] Sgt. Bairett testified that in his experience, third-party registration of a vehicle is a factor in ninety percent of large-quantity drug transport cases. (Tr. at 29.) Moreover, Sgt. Bairett testified that he was aware, based on his training and experience, that I–15 is a major north-south route through the intermountain west, and that the particular location of the stop was a high crime area for the transport of illegal drugs. (Tr. at 30.) These facts also contributed to Sgt. Bairett's suspicions. *See Garcia,* 52 F.Supp.2d at 1252 (providing that although factors such as, the defendant's departure from a known drug-source city, the presence of cell phone, and the routine use of rental vehicles for drug transport, "add little to the reasonable suspicion calculus, they are relevant facts to consider" in deciding whether the officer had reasonable suspicion).

Sgt. Bairett was also aware of the presence of the Jesus Malverde icon inside the vehicle. Sgt. Bairett testified that in his experience the icon is often associated with drug trafficking, and he has encountered the icon in six or seven of about twenty

major "pipeline" drug cases. (Tr. at 15–16, 52.) Additionally, Sgt. Bairett had observed the presence of several air fresheners within the vehicle, emitting a powerful odor. Sgt. Bairett testified that in his experience there is no legitimate reason for multiple air fresheners and they are usually used to cover up something. The Tenth Circuit has recognized that a strong odor may give rise to a reasonable suspicion on the part of law enforcement officials that the odor is being used to mask the smell of drugs. *United States v. Salzano,* 158 F.3d 1107, 1114 (10th Cir.1998); *Villa–Chaparro,* 115 F.3d at 802; *United States v. Hernandez–Rodriguez,* 57 F.3d 895, 898 (10th Cir.1995).

Based on the totality of the circumstances, the court concludes that Sgt. Bairett had the reasonable suspicion necessary to continue to detain the defendant in order to investigate possible criminal activity.

## II. Consent to Search the Vehicle

 Having concluded that the defendant was not being illegally detained when Sgt. Bairett asked to search the vehicle, the court must consider whether the defendant's consent to search was freely and voluntarily given. *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Whether an individual freely and voluntarily gave consent is a question of fact and is determined from the totality of the circumstances. *United States v. Pena,* 143 F.3d 1363, 1366 (10th Cir.), *cert. denied,* 525 U.S. 903, 119 S.Ct. 236, 142 L.Ed.2d 194 (1998).

 The government has the burden of proving valid consent. *Id.; United*

---

**9.** Sgt. Bairett's concerns about possible car theft were not resolved during the detention. He testified that he was still waiting for a

computer response or verification at the time he asked for consent to search. (Tr. at 27.)

*States v. Cody,* 7 F.3d 1523, 1526 (10th Cir.1993). First, "it must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.'" *Pena,* 143 F.3d at 1366 (quoting *United States v. Angulo–Fernandez,* 53 F.3d 1177, 1180 (10th Cir. 1995)). Second, the government must show that the police did not coerce the individual into granting consent. *See id.*

With regard to the first step of this two-part test, the evidence revealed that both the driver and the defendant clearly understood Sgt. Bairett's questions about whether there was contraband in the vehicle, and they understood his request for permission to search the vehicle. Although the phrasing of his request for permission to search was not ideal, given the context in which it was asked, the court concludes that defendant understood that Sgt. Bairett's request, *"I want to look for car, please. Okay?"* was a request to search the Pontiac. *See, e.g., United States v. Gigley,* 213 F.3d 509, 515 (10th Cir.2000) (providing that agreeing to let the officer "look in" the vehicle authorized the officer conduct a search of the vehicle and not just "peer into the windows"); *United States v. Pena,* 920 F.2d 1509, 1514 (10th Cir.1990) (finding that consent to "look in" a car allowed the officer to remove door panels), *cert. denied,* 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991); *United States v. Himes,* 25 Fed. Appx. 727, 732 (10th Cir. Oct.17, 2001) (unpublished) (concluding it is immaterial whether the officers used the words, "look at," "look in," "look through," or "search" to describe the search), *cert. denied,* 535 U.S. 945, 122 S.Ct. 1335, 152 L.Ed.2d 240 (2002).

Prior to asking for permission to search, Sgt. Bairett had separately asked both the driver and the defendant numerous questions about whether there were drugs, specifically marijuana and cocaine, weapons and/or large amounts of money within the Pontiac. Both the driver and the defendant clearly understood these questions and gave specific responses. Immediately thereafter, Sgt. Bairett asked for permission to search. Upon hearing Sgt. Bairett's awkwardly-worded request, both the defendant gave responsive answers and both consented to the search. (Tr. at 33, 34; Pl's Ex. 1.)

The court finds it significant that in prior conversation with Sgt. Bairett, when the defendant failed to understand what Sgt. Bairett was asking, the defendant expressly indicated his lack of understanding saying, *"I don't understand"* and then waiting to answer Sgt. Bairett until he understood the question. (Def's Ex. A at 3.) During this conversation, however, neither the defendant nor the driver appeared confused or expressed a lack of understanding about what the officer was requesting. Neither repeated his request or asked, "what car?" and neither expressed or displayed any surprise when Sgt. Bairett approached the Pontiac and began his search. *See United States v. Lopez,* 777 F.2d 543, 548 (10th Cir.1985) (finding specific and unequivocal consent where defendants told officers they had "nothing to hide" and then "stood by and watched as the officers searched the vehicle and at no time objected"); *see also United States v. Patten,* 183 F.3d 1190, 1194 (10th Cir.1999) ("A defendant's silence and acquiescence may support a finding of voluntary consent."). Moreover, at that point in the detention, both the driver and defendant were well aware that Sgt. Bairett spoke limited Spanish and was doing his best to communicate. As such, his grammatical irregularities were not so remarkable.

Accordingly, although the language barrier rendered the situation less than ideal, when considered in context, the evidence was sufficient to sustain the government's burden to show that the defendant's consent was unequivocal, specific and freely and intelligently given.

Turning to the second part of the two-step test-whether the consent was free from coercion-the court finds the government satisfied its burden of proving that Sgt. Bairett did not coerce the defendant into granting consent. In determining whether consent was free from coercion,

> a court should consider, inter alia, physical mistreatment, use of violence, promises or inducements, deception or trickery, and the physical or mental condition and capacity of the defendant within the totality of the circumstances.

*Pena*, 143 F.3d at 1367 (quoting *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir.1994)). There is no evidence in this case that Sgt. Bairett used inappropriate means to obtain consent. Sgt. Bairett was the only officer at the scene, and his request for consent and the search that followed were conducted along a public highway during daylight. There was no evidence that he mistreated the defendant, or used force or coercion or any other inappropriate tactic. Therefore, the court concludes that the defendant voluntarily consented to the search of the vehicle.

### III. *Miranda Warnings and Waiver*

 Finally, the defendant claims that the government cannot meet its burden to show a valid waiver of *Miranda* because he claims the warning was constitutionally inadequate.[10] The defendant does not allege that his statements to Agent Dunlap were involuntary. Rather, he claims that the interpreter's recitation of *Miranda* "diverged substantially from the warning required by *Miranda*" and failed to "convey the message of *Miranda*." *Id.*

 The government cannot use a defendant's statement stemming from custodial interrogation unless it proves the prior use of procedural safeguards. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The requirement of a *Miranda* warning is triggered by custodial interrogation, that is, the suspect must be in custody, and the questioning must meet the legal definition of interrogation. *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir.1993). A suspect who has been informed of his *Miranda* rights "may waive effectuation of [those] rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. The burden rests with the government to prove a valid waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168–69, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. Amos*, 984 F.2d 1067, 1074 (10th Cir.1993). A court may find proper waiver "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of compre-

---

10. Defendant also claims that Agent Dunlap asked "numerous questions" prior to being given his *Miranda* rights. Def's Mem. in Support at xxv. Review of the evidence reveals, however, that Agent Dunlap asked the defendant only for his date of birth, address, social security number and place of birth prior to having the interpreter recite his *Miranda* rights. Although a defendant who is in custody must be advised of his rights prior to interrogation, *Miranda v. Arizona*, 384 U.S. 436, 467–74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), words and actions that are "normally attendant upon arrest and custody" are not considered "interrogation" for purposes of *Miranda*.

hension." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

■ The evidence in this case is clear that the defendant was advised of his *Miranda* rights, in his native language, prior to interrogation, and that the defendant acknowledged he understood his rights. That the interpreter's recitation of the *Miranda* rights was not a precise or exact translation does not necessarily render the waiver invalid. The Tenth Circuit has stated: "Although language barriers may inhibit a suspect's ability to knowingly and intelligently waive his *Miranda* rights, when a defendant is advised of his rights in his native tongue and claims to understand such rights, a valid waiver may be effectuated." *United States v. Hernandez,* 913 F.2d 1506, 1510 (10th Cir.1990), *cert. denied,* 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991). "The translation of a suspect's *Miranda* rights need not be a perfect one, so long as the defendant understands that he does not need to speak to police and that any statements he makes may be used against him." *Id.; see also Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).

In this case, the interpreter adequately informed the defendant of these basic rights. Specifically, the interpreter stated, in Spanish,

*[T]he officer wants me to read you your rights before you decide if you want to speak or not.... you should understand what your rights are. You have a right to remain silent. Anything that you say can be used against you in a court or open court. You have a right to consult with an attorney .... You also have a right to have an attorney present during the interview. If you*

*cannot afford to pay the costs of an attorney, you will be assigned one before beginning the interview, if that is what you want. If you decide to answer the questions now without an attorney present, you still have the right to finish answering at any time. You also have the right to interrupt the answers or the questions at any time, until you can consult with an attorney.*

Def's Ex. B at 2–3. After explaining these rights, she then asked the defendant if he understood his rights and he answered "yes." (Def's Ex. B at 3.) Thereafter, the interpreter followed up, and specifically asked the defendant if he was willing to talk with Agent Dunlap without an attorney or if he did not want to talk and wanted an attorney. (Def's Ex. B at 4.) The defendant's statement in response, "*I don't know what would be the best,*" indicates that the defendant was aware that he had a choice; that he could talk to Agent Dunlap or he could remain silent and have an attorney represent him. This, coupled with his subsequent decision to answer Agent Dunlap's questions demonstrates that he was aware of, considered, and made a knowing and intelligent waiver of his rights. Accordingly, there is no basis for suppressing the defendant's statements on *Miranda* grounds.

Therefore, based on the foregoing and good cause appearing, IT IS HEREBY ORDERED that defendant's motion to suppress is DENIED.